BRADLEY, Appellant,

v.

FARMERS NEW WORLD LIFE INSURANCE COMPANY, Appellee.

[Cite as *Bradley v. Farmers New World Life Ins. Co.* (1996), 112 Ohio App.3d 696.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950575.

·Decided July 24, 1996.

698

*Schroeder, Maundrell, Barbiere & Powers* and *John W. Hust*, for appellant.

*Dinsmore & Shohl, David H. Beaver* and *Jeffrey R. Schaefer*, for appellee.

SHANNON, Judge.

In December 1992, appellant James M. Bradley filed this action against appellee Farmers New World Life Insurance Company ("Farmers") seeking to recover the proceeds of the life insurance policy issued by Farmers on the life of Bradley's deceased daughter, Ellen Bradley–Harris ("Ellen"). Farmers filed its answer and a counterclaim for declaratory judgment.

 The cause came on for trial on June 26, 1995, and four days later the jury returned its verdict for Farmers. This appeal is from the judgment entered upon that verdict.[1]

---

1. We find nothing within the record other than a fairly cryptic reference in the judgment entry to indicate any formal disposition of the counterclaim for judgment declaring that the insurance policy be rescinded or, alternatively, be held to be void *ab initio* on the ground that it was obtained by insurance fraud. There is no certification pursuant to Civ.R. 54(B). Nevertheless, we accept jurisdiction because the effect of the judgment renders the unadjudicated counterclaim moot, and Civ.R. 54(B) language would be surplusage not necessary to make the judgment final and appealable. See *Gen. Acc. Ins. Co. v. Ins. Co. of North America* (1989), 44 Ohio St.3d 17, 21, 540 N.E.2d 266, 271.

Few, if any, of the facts material to the resolution of the salient issues posed by Bradley's five assignments of error are open to serious doubt. It is the sequence of events which forms the backdrop of the case presented to the jury which makes this matter truly bizarre.

Prior to July 25, 1991, Ellen was a twenty-nine-year-old unmarried woman living with her mother and father in their residence. She was a high-school graduate who had extended that education in a technical school, where she prepared herself for employment in the field of restaurant food service. For some ten or eleven years she held various positions in local restaurants, on occasion in managerial capacities.

On July 25, 1991, Ellen married Lionel Harris, but did not tell her parents of the marriage and continued to live with them as before.

On July 31, 1991, Ellen consulted an agent of Farmers to apply for a policy of insurance on her life. Initially, Ellen sought to purchase coverage of $500,000, but Farmers determined the maximum for which Ellen qualified was $350,000, and, on September 9, 1991, it issued a policy in that amount. Lionel Harris was named as the primary beneficiary and Ellen's father, James, was designated as the contingent beneficiary.

On July 30, the day prior to the application made to Farmers, Ellen had applied to Nationwide Insurance Company for $500,000 of coverage on her life, and that insurer issued its policy in that amount on September 7, 1991, again with Lionel Harris as the beneficiary.

On August 20, 1991, Ellen applied to the State Farm Insurance Company for life insurance in the amount of $200,000, and, on September 17, 1991, a policy, in which Lionel Harris was the primary beneficiary and a close female friend of Ellen's was the contingent beneficiary, was issued extending such coverage.

On August 29, 1991, Ellen applied for and, on September 19, 1991, obtained a policy insuring her life in the amount of $250,000 from Kentucky Central Insurance Company. Again, Lionel Harris was the primary beneficiary.[2]

---

**2.** The jury in this case received evidence of the applications for and the issuance of the several policies. However, the jury was not made aware of the resolution of litigation spawned thereby.

To satisfy the reader's curiosity, we note what Farmers advised this court in its brief:

"This case is the only one that was tried although suits were filed respecting all of them. The Nationwide case was settled after the return of the defense verdict in this case. The Kentucky Central case was a declaratory judgment action brought by Kentucky Central, and it was concluded by an agreed entry rescinding the policy. The State Farm policy was the subject of suit brought by a friend of Ellen's because there it was that friend, rather than Ellen's father, who was listed as the contingent beneficiary. That case has been settled as well."

It is significant for our purposes that Lionel Harris did not, certainly in the applications to Nationwide Insurance Company and Farmers, participate in that process although Ellen disclosed the fact of their marriage to them.

On October 1, 1991, Ellen was murdered, losing her life as the consequence of a shotgun blast to her face, delivered at a distance of one to three feet, as she sat behind the wheel in her automobile on a relatively remote road in the western part of Hamilton County, Ohio. Investigation by police authorities led to the indictment and conviction of Lionel Harris and Matthew Pearson for the homicide, both of whom remain imprisoned for the aggravated murder. Harris had conspired with Pearson to deliver the fatal wound in furtherance of their joint plan to kill Ellen for the proceeds of the insurance on her life.

Farmers' defense to Bradley's claim is that Harris, characterized by Farmers as "the murderer," persuaded Ellen, characterized by Farmers as Harris's "intended victim," to obtain insurance and, after that end was accomplished, murdered her to collect the proceeds of, at least, Farmers' policy. Upon this hypothesis, Farmers concludes that its policy was obtained for an unlawful purpose and was, from its inception, a void and unenforceable contract as a matter of law.

Intrinsic to Farmers' theory is the proposition that Ellen functioned as the "instrumentality of a wrongdoer," Harris the murderer, at his "behest" in furtherance of a "murder plot" to take Ellen's life. Ergo, Farmers submits, the contract of insurance is invalid.[3]

Farmers persuaded the court to charge the jury upon this facet of the case as follows:

"Farmers New World Life Insurance Company must prove by clear and convincing evidence that Ellen Bradley–Harris obtained this policy at the behest of Lionel Harris and as his instrumentality; and, as such that she was an unknowing participant in his unlawful scheme to insure her life and then murder her.

"Now if you find that the life insurance policy in question was acquired as part of a plan to unlawfully obtain life insurance proceeds by murdering Ellen Bradley–Harris, you must find for defendant Farmers New World Life Insurance Company."

---

3. To support this contention, Farmers cites our decision in *Caliman v. Am. Gen. Fire & Cas. Co.* (1994), 94 Ohio App.3d 572, 641 N.E.2d 261. *The case is, on its facts, inapposite.* We held, citing the express provisions of R.C. 2105.19, that neither the estate nor the parents of a wife murdered by her husband were entitled to death benefits payable under a group life policy, obtained through the husband's employer, which named the husband as sole beneficiary; only the husband was entitled to payment, and, upon his disqualification, neither the wife's estate nor her parents had any right to claim the death benefit.

Accordingly, the court submitted this interrogatory to the jury:

"(1) Do you find that Ellen Bradley–Harris applied for and acquired the Farmers life insurance policy as part of a plan by Lionel Harris to murder Ellen Bradley–Harris and collect life insurance money?"

The jury, unanimously, answered the question in the affirmative and consequently returned its verdict in favor of Farmers.

Bradley's first and second assignments of error are:

"1. The trial court erred in instructing the jury that the insured's contract with the insurance company could be voided upon proof by clear and convincing evidence that the insured's spouse, who was not a party to the insurance contract, caused the insured to act at his behest or as his instrumentality in obtaining the life insurance knowing that he intended to murder his spouse.

"2. The trial court's charge to the jury regarding the void *ab initio* defense was inadequate and deficient because it failed to include all of the necessary elements of the defense."

As Bradley sees it, the issue to be decided by this court is whether an innocent contingent beneficiary as named in the policy as father of the insured person, Ellen, is entitled to the proceeds.

We begin the resolution of the questions posed by the first two assignments by stating that there are two givens before us, two facts which are conceded affirmatively by Farmers. First, it is an absolute that Lionel Harris, the murderer, could not in any way benefit from Ellen's death because of the provisions of R.C. 2105.19 (persons prohibited from benefiting by the death of another).[4] It is uncontroverted that Lionel was indicted upon, convicted of and sentenced for the violation of R.C. 2903.01. The second certainty is that Bradley is blameless, a claimant who has in the words of Farmers itself "clean hands."

Bradley argues that Ohio law does not include a recognition of the defense relied upon primarily by Farmers, *viz.*, that its policy never embodied a legally enforceable promise, that it was never a contract, because it was obtained in furtherance of an unlawful purpose, citing *Allstate Ins. Co. v. Boggs* (1971), 27 Ohio St.2d 216, 56 O.O.2d 130, 271 N.E.2d 855. Bradley relies, particularly, upon the declaration in paragraph one of the syllabus of that case:

---

**4.** R.C. 2105.19(A) provides:

"[N]o person who is convicted of, pleads guilty to, or is found not guilty by reason of insanity of a violation of or complicity in the violation of § 2903.01, 2903.02 or 2903.03 of the Revised Code * * * shall in any way benefit by the death. All property of the decedent, and all money, *insurance proceeds* or other property or benefits payable or distributable in respect of the decedent's death, shall pass or be paid or distributed as if the person who caused the death of the decedent had predeceased the decedent." (Emphasis added.)

"Although an applicant's misstatement in an insurance application, if shown to be material to the risk and fraudulently made, is grounds for cancellation of the policy, such representation, standing alone, does not render the policy void *ab initio* and may not be used to avoid liability arising under the policy after such liability has been incurred."

Bradley submits that the current state of the law in Ohio is that Farmers, as an insurer, can void a policy *ab initio* only when the right to do so has been reserved to itself by terms of the policy. He supports this contention by the words of the author of the opinion in *Boggs*, Chief Justice O'Neill.

The Chief Justice first observed that "[i]n the law of insurance, a representation is a statement made prior to the issuance of the policy which tends to cause the insurer to assume the risk." In context, we find in *Boggs*, 27 Ohio St.2d at 219–220, 56 O.O.2d at 132, 271 N.E.2d at 858:

" * * * an insurer is bound by the provisions which he chooses to incorporate in his policy. If it is his purpose to provide that a misstatement by the insured shall render the policy void *ab initio*, such facts must appear clearly and unambiguously from the terms of the policy."

Without question, the policy here considered does not contain such a provision.

It is clear that the point upon which Farmers' defenses pivot is that the acts of Ellen, the insured, robbed the policy of all legal force, *i.e.*, that in one way or another Farmers was induced fraudulently to issue its policy. This brings us to the second branch of the defenses.

In Farmers' words, the second, or subsidiary, defense is that Ellen "lied and misrepresented by concealing facts which would have caused Farmers to refuse to issue the policy." First, Farmers contends, Ellen concealed "the fact that there was another life insurance policy pending at the time of her application for the Farmers policy." This is an allusion to Ellen's application to Nationwide on the day preceding her contract with the agent for Farmers. Next, Farmers asserts that Ellen "concealed that she had obtained and applied for even more insurance by the time she accepted the Farmers policy."

The jury received evidence relating to Ellen's multiple applications to substantiate Farmers' defense that, as testified to by a witness qualified as an expert in the field of insurance fraud, such information would be material to any life insurer. Farmers argued to the jury:

"The truth of what we have here is murder for insurance money. Nothing makes sense about any of this unless Lionel, who we know killed Ellen, was the driving force to obtain the insurance money, the insurance policies. Nothing else makes any sense. Nothing makes—nothing else makes sense. Why would Ellen

have applied as often as she did within the time sequence she did for as much as she did unless she was driven by something or someone?

"After the Judge gives you the instructions and you go to deliberate, you'll find that there is going to be two written questions put to you to answer yes or no. It's not a maybe. It's a yes or no in regard to what you now understand, I think, pretty well, is Farmers' initial position; that is, it's unlawful because it's part of a murder plot.

" * * *

"At the beginning of a case I told you basically what Farmers' position was, and let me run through it real quick again. It's sort of two parts. The first part is what we've just gone through. The Farmers policy issued to Ellen Bradley–Harris in this case is not a life insurance policy; it's an unlawful contract. That's No. 1. We've just talked about that.

"I want to now get to No. 2. Number 2 is that the policy has no effect because Ellen lied to get it, lied to Farmers about something that was important to Farmers, something that was material. And she didn't lie just once. Our position is she lied twice. She lied first when she applied. She lied again on September 9th when she accepted the policy."

The second interrogatory given to the jury is:

"Do you find that Ellen Bradley–Harris submitted information to Farmers at either the time of her application or at the time she accepted the policy that was willfully false, fraudulently made, and material; that such information induced Farmers to issue the policy, but for such information it would not have been issued, and that Farmers had no knowledge of the falsity or fraud of the information?"

After reading the second interrogatory to the jury and giving it the language appearing upon the face of the general verdict form, the court proceeded to give this charge:

"So, actually, to explain something further, if you find in Interrogatory No. 1 that the answer to that is yes, that Ellen Bradley–Harris applied for and acquired the life insurance policy as part of a plan by Lionel Harris to murder Ellen Bradley–Harris to collect life insurance—if you answer that yes, that it's voidable, you've really completed the case, and it's a verdict for the defense at that point. You're done. You just check off for the defense, and that's it. 'We, the jury, in the issue joined, find in favor of the defendant'—check it off and you're done."

After the jury answered the first interrogatory "yes," it followed the court's instructions and returned its verdict in favor of Farmers.

The legal questions raised by the submission of evidence of Ellen's several applications and the thesis upon which Farmers employed that evidence in presenting its defenses are given us in Bradley's fourth and fifth assignments of error:

"4. The trial court erred in overruling Bradley's motion for directed verdict at the close of defendant's case with reference to its defense under R.C. 3911.06 because there is insufficient evidence in the record to submit this issue to the jury.

"5. The trial court erred to the prejudice of plaintiff-appellant by admitting evidence of subsequent applications for life insurance made by Ellen Bradley–Harris after her application to Farmers."

Bradley contends that R.C. 3911.06 is the means by which an insurer may void a policy because it provides:

"No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer."

In response, Farmers argues that the evidence is sufficient to permit reasonable minds to infer that Ellen had fraudulently concealed information material to Farmers. Farmers argues alternatively that since the jury found the contract of insurance to be void *ab initio,* R.C. 3911.06 was not determinative of the outcome and, resultantly, any error with respect to admission of evidence relative to its defense under R.C. 3911.06 constitutes harmless error.

Civ.R. 61 defines "harmless error":

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

Although Farmers states them separately, its twin defenses have a common chord. It alleges that Ellen was the "pawn" of Harris, a "puppet" under his control, an "instrumentality" acting at his "behest" who "duped" Farmers by failing to disclose information vital to Farmers and who became a liar when

completing her application for the policy, and compounded the lie that there was no other life insurance pending on July 31, 1991, by failing to inform Farmers of other insurance in force when Farmers' policy was delivered to her on September 9, 1991.

The question, then, is did Ellen lie? The answer depends upon the complete truthfulness of her response to question number 7 on Farmers' application form: "Is any life insurance in force or pending on the life of any Applicant(s)?"

Farmers cannot dispute that Ellen disclosed the existence of an insurance policy on her life on July 31, 1991, because the application as completed by its agent shows on its face that, in answering question number 8, Ellen detailed her answer to question 7 by informing Farmers that her life was insured for $36,000 in a Prudential Insurance Company term life policy through her employer. Nevertheless, Farmers advanced its defense that nondisclosure of her application to Nationwide on July 30, 1991, constituted a material misrepresentation to Farmers.

The resolution of this problem in the case depends upon whether the term "any life insurance * * * pending" as used in question 7 includes an application for life insurance. Bradley contends that the very language in which Farmers chose to frame question 8 limits the question to policies of insurance in force because it requires the applicant to provide the policy number, the amount of coverage and whether the applicant intends to keep that policy in force.

The record before us fails to provide a clear answer to the question. The best that can be said is that there is a conflict in the evidence, even within the testimony of the agent of Farmers who read the questions upon the application to Ellen and then wrote Ellen's answers on the form.

Were it not for the fact that the evidence relied upon by Farmers to establish its misrepresentation defense is so intertwined with its defense that the policy was void *ab initio*, Bradley's fourth and fifth assignments would be mooted by the jury's verdict. However, we are convinced that we must dispose of those assignments upon their merits in conjunction with the assignments as a whole.[5]

---

5. Farmers' counsel opened his argument to the jury with these words:

"Ladies, this case isn't going to rise or fall—you're not going to let it—on some word, quibbling about whether 'any insurance in force or pending' really means, 'Is there a policy that's in force or is there pending another application?'

"And this case isn't going to rise and fall—because you aren't going to let it. I mean, you can't—on what a claims adjuster, going through the file on this, lists when she talks about the $36,000 term policy and calls it pending.

"This is what she was looking at. You don't know whether that's pending or in force. You just know there's a Prudential policy there for 36,000. This case isn't going to be decided on these things."

■ With respect to Farmers' second affirmative defense, the court began its charge in these words:

"If you find that the life insurance policy issued to Ellen Bradley–Harris by the defendant, Farmers New World Life Insurance Company, was acquired for a lawful purpose, then you must find for the plaintiff, James M. Bradley, that the policy is valid and enforceable. In that case you must find as I will instruct you that the policy was properly applied for.

"Concerning that, let me instruct you about false information on the policy application. If you find that the Farmers life insurance policy was not issued as part of Lionel Harris' plan to murder Ellen Bradley–Harris and is otherwise valid and enforceable, you must then determine whether the information she provided to Farmers on the policy application in and of itself renders the policy voidable.

"The defendant is required to prove by clear and convincing evidence the elements of voidability set forth in R.C. 3911.06."

The court then read R.C. 3911.06 verbatim and charged:

"Accordingly, in order to void the policy under the statute, Farmers must prove each of the following six elements by clear and convincing evidence:

"(1) That the information submitted by Ellen Bradley–Harris to Farmers, at the time of her application or at the time she accepted the policy, was willfully false;

"(2) That it was fraudulently made;

"(3) That it was material;

"(4) That it induced Farmers to issue the policy;

"(5) That but for such answer the policy would not have been issued; and

"(6) That neither the company nor its agent had knowledge of the falsity or fraud of the answer."

Farmers' agent who filled out Ellen's application testified that Ellen knew that Farmers could investigate her "background," could contact family and friends and could contact an organization identified as the Medical Information Bureau to determine whether Ellen had applied for insurance elsewhere. The agent admitted further:

"Q. When the policy is returned, the only form she fills out is that policy acceptance form that you read for us?

"A. Yes, for her case, it was.

"Q. So neither the application nor the policy acceptance form asked of Ellen to tell you whether she applied elsewhere for insurance from the time she left your office on July 31st of '91?"

We are convinced that the record fails to provide either direct evidence that Ellen submitted information upon the application which was willfully false or any basis from which reasonable minds could infer that the elements enumerated in R.C. 3911.06 had been proven clearly and convincingly.

All of this brings us to the issue posed by Bradley's fourth assignment: Did the court err in overruling Bradley's motion for a directed verdict upon Farmers' second affirmative defense?

We are given the basic precept in *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, paragraph one of the syllabus:

"A motion for a directed verdict does not present a question of fact or raise factual issues, but instead presents a question of law, even though in deciding such a motion it is necessary to review and consider the evidence. (Paragraph three of the syllabus in *O'Day v. Webb,* 29 Ohio St.2d 215, [58 O.O.2d 424, 280 N.E.2d 896, (1992)] and in *Rohde v. Farmer,* 23 Ohio St.2d 82, [52 O.O.2d 376, 262 N.E.2d 685 (1970)] approved and followed.)"

In writing for the Court of Appeals for Franklin County, Judge Moyer, now Chief Justice of the Supreme Court of Ohio, expanded upon that concept in *Eldridge v. Firestone Tire & Rubber Co.* (1985), 24 Ohio App.3d 94, 96, 24 OBR 164, 166, 493 N.E.2d 293, 295:

"The determination to be made by a trial court when a motion for directed verdict has been made is not whether one version of the facts presented is more persuasive than another; rather, it is a determination that only one result could be reached under the theories of law presented in the complaint. When a motion for directed verdict is entered, it is the legal sufficiency of the evidence to take the case to the jury that is being tested. The trial court may not weigh the evidence or try the credibility of witnesses, but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. The 'reasonable minds' test of Civ.R. 50(A)(4) requires the court only to determine whether there is any evidence of substantial probative value in support of the non-moving party's claim. A motion for a directed verdict raises a question of law because it examines the materiality of the evidence rather than the conclusions to be drawn from the evidence. See *Ruta v. Breckenridge–Remy Co.* [*supra*]."

Simply put, upon this record Farmers' second affirmative defense should never have been taken to the jury. The dearth of evidence bearing upon any conceivable misrepresentation within Ellen's application should have persuaded the court

to grant Bradley's motion for a directed verdict because, as a matter of law, there was no evidence of substantial probative value to support Farmers' claim.

Accordingly, we hold the fourth assignment of error to be well taken.

■ The fifth assignment is companion to the fourth and raises an issue connected vitally to the fourth.

Farmers adduced in its defense evidence of Ellen's applications to State Farm Insurance Company, Kemper Insurance Company and Kentucky Central Life Insurance Company. All were made subsequent to Ellen's application to Farmers on July 31, 1991. State Farm and Kentucky Central issued and delivered their policies after Farmers issued its policy. None was issued by Kemper. Farmers argues that allegedly false statements in those applications are competent evidence to prove that "the concealments in this case were willfully false and fraudulently made and were part of an elaborate unlawful plan" properly admitted under Evid.R. 404(B). Farmers contends that the multiple applications prove that Ellen was not confused or mistaken when answering Farmers' question number 8, and that she was involved in Harris's murderous scheme; in its view, such evidence was not proscribed by the rule, *viz.*, it was not used to prove Ellen's character or trait of character in conformity with which she acted on July 31, 1991, to defraud Farmers.

We are persuaded by and, accordingly, adopt for our purposes here the observation of the Court of Appeals for Cuyahoga County in *Cardinal v. Family Foot Care Centers, Inc.* (1987), 40 Ohio App.3d 181, 532 N.E.2d 162, as summarized in its second headnote:

"The rationale for the admission of evidence pursuant to Evid.R. 406 is that habitual acts may become semi-automatic and may tend to prove one acted in the particular case in the same manner. However, the evidence must actually rise to the level of a habit or the use of Evid.R. 406 would defeat the purpose of Evid.R. 404(B) which prohibits the admission of evidence of other acts to show that someone acted in conformity with those acts in the instant case."

It follows, then, from our holding above that Farmers' evidence to support its second defense was not sufficient in law to make that defense a question for the jury, and that the court erred in admitting evidence of other and subsequent applications. Added to that is the lack of any instruction limiting the use by the jury of the evidence purportedly admissible under Evid.R. 404(B).

For the combined reasons given in our rulings on the fourth and fifth assignments, the fifth assignment is well taken.

■ We elect to consider the first, second and third assignments as a unit beginning with the third, which is:

"The trial court erred in overruling plaintiff-appellant's motion for directed verdict as to defendant-appellee's void *ab initio* defense."

The essence of Farmers' defense is contained in the jury instruction which it persuaded the court to give:

"To void this contract Farmers New World Life Insurance Company must prove by clear and convincing evidence that Ellen Bradley–Harris obtained this policy at the behest of Lionel Harris and as his instrumentality; and, as such, that she was an unknowing participant in his unlawful scheme to insure her life and then murder her."

The *sine qua non* of Farmers' hypothesis is that Ellen acted as Harris's instrument. Inasmuch as the court gave the jury no special definition of the word "instrumentality," it, as the court charged, was required to use its normal and customary meaning in the English language.

Among the meanings of "instrumentality" given in Webster's Third New International Dictionary (1986) 1172, is "agent." Without question, that is the meaning employed by Farmers, adopted by the court in making its several rulings in the course of the trial, and reflected in the charge. The prerequisite was that Ellen acted as the agent for Harris so that the contract of insurance was invalid as being the product of Harris's murderous intent. For Farmers' affirmative defense to be effective, Harris's intent must have been in law transferred to Ellen. Absent that fatal taint, the policy was acquired for a lawful purpose, one which was valid and enforceable, obligating Farmers to pay the proceeds to Bradley. Indeed, that is what the court told the jury:

"If you find that the life insurance policy issued to Ellen Bradley–Harris by the defendant, Farmers New World Life Insurance Company, was acquired for a lawful purpose, then you must find for the plaintiff, James M. Bradley, that the policy is valid and enforceable. *In that case you must find as I will instruct you that the policy was properly applied for.*" (Emphasis added.)

■ Agency is a contractual relation created by agreement of the parties. As between principal and agent, the creation of the agency relationship arises from the agreement of the parties to the existence of the relationship. It is basic law in Ohio that a person may authorize another to do for him whatever he may lawfully do for himself. See *McCleary v. McLain* (1853), 2 Ohio St. 368. The converse is equally true. No one will be permitted to delegate authority to do an act which is illegal or opposed to public policy. See *Gross v. Campbell* (1928), 118 Ohio St. 285, 160 N.E. 852. Accordingly, the law will not recognize the existence of any agency under which it is contemplated that the agent will procure property rights for the principal by fraud or other undue means. See *Cincinnati, Wilmington & Zanesville RR. Co. v. Iliff* (1862), 13 Ohio St. 235.

Ohio courts have traditionally defined a contract as an agreement upon sufficient consideration to do, or not to do, a particular thing. See *Lawler v. Burt* (1857), 7 Ohio St. 340. To be valid, there must be, *inter alia,* a lawful subject matter, a meeting of the minds of the parties and an actual agreement to do the thing proposed in the agreement from which the contract emerges. To be binding, the parties to the contract must have a common and distinct intention communicated by each party to the other. *Id.*

Farmers' theory that the policy upon Ellen's life is void *ab initio* fails to take into account the law that agency is a contractual relation which requires that the purpose of the agency, *viz.,* the act to be done, must first be lawful and second be one agreed upon, *viz.,* the result of a meeting of the minds between the principal and the agent.

From this we find the conclusion to be inescapable: no one can be an unknowing agent, especially as theorized by Farmers, to perform an unlawful act by persuading an insurer to issue a policy at the behest, *i.e.,* the instruction or command, of the principal whose purpose is to murder the insured who is his agent.

Farmers' thesis that Ellen was "the unwitting pawn," an "unknowing participant" in Harris's murderous plot is one we reject out of hand because there is not a scintilla, not a shred, of evidence, within this record, upon which any reasonable mind could find it to exist factually.

The Farmers agent who took Ellen's application testified in plaintiff's case:

"Q. How would you describe Ellen that day when she came in when you first met her?

"A. She seemed happy.

"Q. Would you describe her as upbeat?

"A. Yes, I would.

"Q. And would you describe her as having a very distinctive personality?

"A. Definitely.

"Q. Did she tell you she was a newlywed?

"A. Yes."

Farmers' agent wrote upon the application form in that part labeled "Special Instructions/Remarks":

"Ellen is a newlywed. Her husband has a $500,000 Universal policy. She wants $500,000 because she is planning on having a family, her income will be increasing a lot, she wants to protect her insurability and she wants the same amount as her husband."

Farmers' agent testified that Ellen wanted to have the policy "as soon as possible," that she called "two or three times" about it, and that she was "visibly upset" and "very nervous" when informed that the coverage had been reduced to $350,000. Ellen told the agent that she was upset because her husband "was going to be very angry." Other than those descriptions of Ellen's demeanor, the record contains no evidence of any emotional state indicative of morbidity on her part.

This brings us to the subject of Ellen's diary, or diaries, upon which Farmers relies to establish Ellen's state of mind when applying for the policy. Farmers characterizes one diary as "true," that being the diary reflecting Ellen's thoughts and impressions in words of her free choice, and a second is characterized as "bogus." Farmers argues that the bogus diary was kept at Harris's direction, and that the entries were dictated by him to recite "an outlandish scenario of Ellen and Lionel [Harris] being pursued by unidentified goons who were really after Lionel." Apparently, Harris had ordered Ellen to keep this second diary on her person "at all times."

The destructive flaw in Farmers' theory on this score is that the critical entries in the "true" diary appear on dates subsequent to July 31, 1991, which appear to reflect Ellen's growing fear of Harris.

In order to find Farmers' primary affirmative defense to be tenable there must be evidence to show that Harris had formed his murderous intent, one to be carried out unwittingly and unknowingly by Ellen, on or before July 31, 1991. As we see it, the evidence fails to establish upon any standard of proof that Harris had an intention to murder Ellen on July 31, 1991. In any event, the charge to the jury was so Spartan that it did not include that essential element.

We hold that even if it can be said that Harris procured the policy through Ellen as his instrument, Farmers' void *ab initio* defense must fail because there is no credible, probative, substantial evidence upon which to predicate proof, directly or inferentially, that when Ellen applied for the policy she was, in law, acting as Harris's agent to perform an act for a purpose made unlawful because of Harris's then present intent to murder her for money.

For the reasons expressed above standing alone, the judgment in this case must be reversed. The verdict was reached upon an imperfect instruction and upon evidence which was insufficient in law and weight to sustain it.

This brings us, finally, to the point of law in the third assignment.

For the reasons given and the conclusions reached in our resolution of Bradley's fourth assignment, we hold that the court erred when it overruled Bradley's motion for a directed verdict respecting Farmers' first affirmative

defense that the policy was void *ab initio*. Bradley's first, second and third assignments of error are, like his fourth and fifth, well taken.

Consequently, we hold that the judgment below must be reversed, and set aside to be held for naught, and that this cause must be remanded to the Hamilton County Court of Common Pleas with instructions to enter judgment in favor of the plaintiff, James M. Bradley, against the defendant, Farmers New World Life Insurance Company, in the sum of $350,000, plus interest, and any other sum payable under its policy insuring the life of Ellen M. Bradley–Harris as prayed for in the complaint.

*Judgment accordingly.*

MARIANNA BROWN BETTMAN, P.J., and SUNDERMANN, J., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.