BOLLINGER, INC., f.k.a. Little People's Workshop, Ltd., et al., Appellees,

v.

MAYERSON et al., Appellants; Wick et al.

[Cite as *Bollinger, Inc. v. Mayerson* (1996), 116 Ohio App.3d 702.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950238.

Decided Dec. 18, 1996.

704

*Manley, Burke, Lipton & Cook, Robert E. Manley* and *Carol S. Wood,* for appellees.

*Vorys, Sater, Seymour & Pease, Daniel J. Buckley, Andrew M. Kaplan* and *Phillip J. Smith; Greenebaum, Doll & McDonald, William T. Robinson III* and *Margaret E. Keane,* for appellants.

DOAN, Judge.

Appellee Marilyn Bollinger was the principal shareholder and chief executive officer of Little People's Workshop, Ltd. ("Old Company"), now known as appellee Bollinger, Inc. Old Company, which marketed and sold early childhood education curricula, was started in 1972 by Bollinger's mother. As a result of cash flow problems, in 1991 Bollinger engaged LaRue Simpson of McDonald & Co. to seek investors for Old Company. Through Simpson, Bollinger met appellant Manuel D. Mayerson, along with Chad Wick and Peter Bloch who worked for Mayerson. Discussions began concerning the sale of Old Company.

The negotiations for the sale of Old Company took place over several months. Initially, the parties contemplated that the sale would be structured as a stock transfer. Bollinger presented a business plan purporting to show that with

$500,000 of new investment, Old Company would accumulate positive cash flows of approximately $12,000,000 over a five-year period.

During the period of negotiations, Bollinger and Mayerson executed two letters of intent, the second of which provided:

"The Purchaser shall infuse or cause to be infused the necessary capital into the Company to reduce the Company's payables and to provide working capital, either as a contribution to capital or in the form of subordinated debt with reasonable terms, to implement the Company's business plans."

The letters of intent also contained "no-shopping agreements," prohibiting Bollinger from entering into discussions with any other prospective purchasers. The letters further stated that "any additional legal obligations between the parties shall only be as set forth in duly negotiated and executed Definitive Agreements which must be satisfactory to the parties in both form and content."

Because of the seasonal nature of its business, in the spring of 1991, Old Company needed capital to prepare for the upcoming sales season. In spite of the fact that no deal had been finalized, Mayerson urged Bollinger to prepare for the sales season, and he made various loans to Old Company to cover past debts and debts to be incurred for the sales season activity. The letters of intent expired prior to the consummation of any deal.

After the letters of intent expired, Mayerson wanted to restructure the deal so that the assets of Old Company would be transferred to a new corporation called Little People's Workshop, Inc. ("New Company"). New Company was formed solely for the purpose of purchasing the assets of Old Company. Mayerson claimed that he wanted to structure the deal in this way for tax purposes.

Shortly before the execution of the written agreements to transfer the assets of Old Company to New Company, Bollinger's attorney, James Strauss, met with Mayerson's agent, Chad Wick. Strauss testified at trial that when he specifically asked Wick how Bollinger would be protected in the new deal, Wick told Strauss that Mayerson would put the necessary funds into New Company to make the deal work for Bollinger. Strauss testified:

"Mr. Wick went into a very eloquent explanation about how they had been to the bank and how Mr. Mayerson was not going to guarantee the loan of the New Company at the bank. But how he had—he just didn't guarantee things in writing anymore but how he had assured the bank that they would be repaid their money and the bank had been satisfied with this.

"And I went on to say to Mr. Wick, who was representing Mr. Mayerson, well, how in the world can Little People's Workshop, Ltd., or Mrs. Bollinger be assured that Mr. Mayerson will provide the funds necessary for this business to grow and prosper, going forward and to pay—pay its obligation?

"And Mr. Wick simply said, the money will be there. We will provide the money that's necessary for this transaction to work. And I reported that to Mrs. Bollinger."

Throughout the negotiations, when Mayerson was asked to provide in writing his personal guarantee that New Company would have the funds to meet its obligations and to expand, Mayerson refused. In fact, Strauss testified that Mayerson repeatedly declined to put any such guarantee in writing.

On May 24, 1991, Peter Bloch, on behalf on Mayerson, along with Bollinger, made a presentation to Star Bank, stating that $1,400,000 in immediate funds was needed to pay past debts and fund planned growth of the business. Bloch also assured the bank that Mayerson and the Manuel D. Mayerson and Rhonda Mayerson Foundation ("Foundation") were solidly behind the company. Bloch admitted at trial that these representations were made to the bank at a time when Mayerson had already decided that neither he nor his Foundation would purchase Old Company, but that instead New Company would be formed to receive the assets of Old Company.

The terms of the sale of the assets of Old Company to New Company were set forth in three separate agreements: (1) the Asset Purchase and Sale Agreement between Old Company and New Company, (2) the Royalty Agreement between Old Company and New Company, and (3) the Employment Agreement between Bollinger and New Company. Attached to both the Employment Agreement and the Royalty Agreement was a copy of Bollinger's business plan, which contemplated an investment of $500,000. All three agreements contained integration clauses.

The Asset Purchase and Sale Agreement provided:

"10.11  *Entire Agreement.*  This Agreement, including the Schedules hereto, contains the entire understanding of the parties related to the subject matter hereof and shall not be amended or modified in any way except by subsequent agreement executed in writing. All representations of any type relied upon by the parties hereto in making this Agreement are specifically set forth herein, and each party acknowledges that it has relied on no other representation, and each party hereby waives any and all claims which it may have against the other based on any representation heretobefore made and not specifically set forth herein."

The Employment Agreement stated:

"20.  *Complete Agreement.*  This Agreement embodies the entire understanding and agreement of the parties with respect to Bollinger's employment by the Company, and it supersedes any prior or contemporaneous agreement or understanding pertaining thereto * * *."

The Royalty Agreement provided:

"10. *Complete Agreement.* This Agreement embodies the entire understanding and agreement of the parties with respect to payment of Royalties to Bollinger, Inc. or any other entity or individual."

As part of the sales transaction, Old Company changed its name to Bollinger, Inc., and bought its stock back from its minority shareholders in exchange for promissory notes. Bollinger used a building that she owned as collateral for the promissory notes. New Company issued an umbrella promissory note to Bollinger, Inc., to cover payments to be made to Old Company's minority shareholders on the promissory notes issued to them.

New Company operated for a short period of time with Bollinger as president. In order to capitalize New Company, Mayerson arranged for a $500,000 loan from Star Bank, and he invested $700,000, $500,000 of which was a subordinated loan and $200,000 of which was a contribution to equity. After an existing $300,000 loan was paid, the net infusion of funds to New Company was $900,000.

New Company began to fail. Debts went unpaid. Payments were not made to Bollinger, Inc., to reimburse it for payments to Old Company's minority shareholders on their promissory notes. A royalty payment due Bollinger, Inc., on January 1, 1992, was not made. Mayerson refused to put any more capital into New Company. Mayerson demanded that Bollinger and Bollinger, Inc., renegotiate the contracts. Apparently, the royalty agreement and salary consideration given Bollinger were drawbacks to potential investors looking at New Company. Bollinger refused to renegotiate.

Within approximately seven months, New Company filed for Chapter 11 bankruptcy reorganization. Star Bank was told that the reorganization was a "counter move to deal with the quickly deteriorating relationship between the Mayerson Group and Marilyn Bollinger." New Company terminated Bollinger's employment contract. Because New Company failed to make payments on the promissory note it had issued to Bollinger, Inc., Bollinger was unable to make payments on the promissory notes issued to Old Company's minority shareholders, and the shareholders foreclosed on the building which Bollinger had put up as collateral.

Bollinger and Bollinger, Inc., filed proofs of claim in the bankruptcy court. Although Bollinger and Bollinger, Inc., argued that the Chapter 11 action had not been filed in good faith, the bankruptcy court confirmed the reorganization plan on March 17, 1993.

The within complaint, which was subsequently amended twice, was initially filed by Bollinger and Bollinger, Inc., on May 6, 1992. The complaint included, among other things, claims for fraud and breach of oral contract. The claims were based upon an alleged oral promise by Mayerson to provide funds without

limit to cover New Company's obligations. The complaint also alleged that the Chapter 11 bankruptcy petition was filed in bad faith in order to defraud Bollinger and Bollinger, Inc., of the benefits of the sale of Old Company. Mayerson filed a counterclaim alleging fraud. The proceedings were stayed while the bankruptcy action was pending. After the bankruptcy stay was lifted, the case proceeded to trial on October 18, 1994.

At the close of plaintiffs' case, defendants moved for a directed verdict on the issues of fraud and breach of oral contract. The trial court overruled the motion. At the close of all the evidence, the motion for directed verdict was renewed. The trial court granted the motion for directed verdict as to defendants Wick and Bloch, but denied it as to defendants Mayerson and the Foundation. The trial court submitted plaintiffs' claims for fraud and breach of oral contract as well as Mayerson's counterclaim for fraud to the jury. The jury returned a general verdict in favor of Bollinger and Bollinger, Inc., in the amount of $5,000,000. The jury also found against Mayerson on his counterclaim.

The trial court entered final judgment in favor of plaintiffs on November 22, 1994. Mayerson and the Foundation subsequently filed motions for judgment notwithstanding the verdict, new trial, and remittitur, which the trial court overruled. Mayerson and the Foundation appealed, raising five assignments of error for our review.

The first assignment of error alleges:

"The trial court erred in denying defendants' motions for directed verdict and judgment notwithstanding the verdict because plaintiffs' claims for fraud and breach of oral promise were precluded by the doctrines of *res judicata* and collateral estoppel."

Mayerson and the Foundation argue that the claims for fraud and breach of oral contract were or could have been litigated in the bankruptcy action and, therefore, they are precluded by the bankruptcy judge's confirmation of the reorganization plan and finding that the plan had been proposed in "good faith."

Parties to a bankruptcy proceeding are barred by the doctrine of *res judicata* from attempting to relitigate any claims which were or could have been raised in the bankruptcy proceeding. *In re Brady, Texas Mun. Gas Corp.* (C.A.5, 1991), 936 F.2d 212, certiorari denied (1991), 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 748. A judgment in bankruptcy court bars a subsequent suit if (1) both cases involve the same parties, (2) the prior judgment was rendered by a court of competent jurisdiction, (3) the prior decision was a final judgment on the merits, and (4) the same cause of action is at issue in both cases. *Latham v. Wells Fargo Bank, N.A.* (C.A.5, 1990), 896 F.2d 979, 983; *Jungkunz v. Fifth Third Bank* (1994), 99 Ohio App.3d 148, 151, 650 N.E.2d 134, 136.

■ In the bankruptcy action, Bollinger and Bollinger, Inc., pursued claims against New Company based upon the three written contracts that constituted the transfer of assets from Old Company to the Company. The agreed order settling plaintiffs' claims in the bankruptcy case provides:

"5. This Agreement constitutes a full and final settlement of all claims arising out of all contracts, including the Asset Purchase and Sale Agreement, the Employment Agreement and the Royalty Agreement between the Debtor and Bollinger. To this extent, neither party has any further obligations with respect to the above-mentioned contracts."

In the case *sub judice*, Bollinger and Bollinger, Inc., pursued claims for fraud and breach of oral contract against Mayerson, individually, and the Foundation. The claims did not depend upon plaintiffs' status as creditors of New Company. Bollinger also alleged that she suffered damages which were, at least in part, distinct from those covered by the three contracts which were adjudicated in the bankruptcy court. The causes of action are not the same as those raised in the bankruptcy action. Therefore the bankruptcy court proceedings do not bar the claims for fraud and breach of oral contract pursuant to the doctrine of *res judicata*.

■ Appellants also argue that Bollinger and Bollinger, Inc., were collaterally estopped from relitigating whether New Company's petition in bankruptcy was filed in good faith because that issue was litigated in and decided by the bankruptcy court. Collateral estoppel bars the relitigation of specific issues which have been "actually and necessarily litigated and determined in a prior action" even though the plaintiff asserts a new cause of action in the subsequent proceeding. *Krahn v. Kinney* (1989), 43 Ohio St.3d 103, 107, 538 N.E.2d 1058, 1062; see *Cincinnati Cent. Credit Union, Inc. v. Benson* (July 19, 1995), Hamilton App. Nos. C–940278 and C–940479, unreported, 1995 WL 421854.

■ In order to apply collateral estoppel to bar the litigation of an issue, five requirements must be met: (1) the specific issue must be identical to the issue previously determined, (2) the issue must have been actually litigated by the parties, (3) the prior judgment must be a valid and final resolution of the initial dispute, (4) the resolution of the issue in question must have been essential to the earlier judgment, and (5) there must be mutuality between the parties. *Burson v. The Peoples Bank* (Aug. 20, 1991), Wyandot App. No. 16–90–39, unreported, 1991 WL 217708.

■ It is appropriate to dismiss a Chapter 11 bankruptcy petition for cause if it appears that the petition was filed in bad faith. *In re Madison Hotel Assoc.* (C.A.7, 1984), 749 F.2d 410; *In re Albany Partners, Ltd.* (C.A.11, 1984), 749 F.2d 670. In the bankruptcy court, Bollinger and Bollinger, Inc., filed a motion to

show cause why New Company's voluntary petition in bankruptcy should not have been dismissed for failure to file in good faith. Bollinger and Bollinger, Inc., argued that New Company had no real intention to reorganize, but that its sole purpose in filing the bankruptcy petition was to protect Star Bank at the expense of Bollinger, Bollinger, Inc., and the remaining creditors. Bollinger and Bollinger, Inc., directed the bankruptcy court's attention to the Star Bank memorandum that referred to the filing of the bankruptcy petition as "a counter move to deal with the quickly deteriorating relationship between the Mayerson Group and Marilyn Bollinger" and to Wick's statement that "the Mayerson Group feels they can best negotiate with Bollinger through the bankruptcy court." The bankruptcy court ultimately confirmed New Company's reorganization plan.

The finding that New Company's Chapter 11 petition in bankruptcy was filed in good faith was necessary to the bankruptcy court's ultimate confirmation of the reorganization plan. The issue was raised and litigated in the bankruptcy court, and therefore Bollinger and Bollinger, Inc., are collaterally estopped from relitigating whether the bankruptcy petition was filed in good faith.

The first assignment of error is sustained to the extent that it alleges that Bollinger and Bollinger, Inc., were collaterally estopped from litigating the issue of good faith in the filing of New Company's bankruptcy petition. It is overruled to the extent that it alleges that the claims for fraud and breach of an oral contract were precluded by the doctrine of *res judicata.*

The second and third assignments of error will be considered together. They allege:

"The trial court erred in failing to grant defendants' motions for directed verdict and judgment notwithstanding the verdict as to plaintiffs' claims for fraud and breach of an oral promise because, as a matter of law, plaintiffs' alleged reliance was not justifiable;

"The trial court erred in overruling defendants' motions for directed verdict and judgment notwithstanding the verdict because plaintiffs' claims for fraud and breach of an oral promise were barred by integration clauses."

Mayerson and the Foundation argue that the integration clauses contained in the Asset Purchase and Sale Agreement, the Royalty Agreement, and the Employment Agreement bar the claims for fraud and breach of an oral contract as they relate to the alleged oral promise by Mayerson to provide New Company with limitless funds in order to meet its obligations.

During the period of negotiations for the sale of Old Company, Bollinger and Mayerson, as trustee, entered into two letters of intent. Both letters of intent stated that the legal obligations of the parties "shall be only as set forth in duly negotiated and executed Definitive Agreements * * *." The "Definitive Agree-

ments" referred to were the Asset Purchase and Sale Agreement, the Royalty Agreement, and the Employment Agreement. All three agreements contained integration clauses as previously set forth. The Asset Purchase and Sale Agreement, executed by Bollinger and Mayerson, as trustee, stated that "all representations of any type relied upon by the parties" were "specifically set forth" in the agreement and that the parties waived "any and all claims" based upon any prior representation not specifically set forth in the agreement. Similarly, the Royalty Agreement stated that it embodied the entire agreement of the parties with respect to the payment of royalties, and the Employment Agreement stated that it embodied the entire agreement of the parties with respect to Bollinger's employment. The business plan, which was prepared by Bollinger and attached to the agreements, called for an infusion of $500,000 in capital.

Bollinger was represented by counsel throughout the negotiation and signing of the agreements. During the negotiations, when Mayerson was asked to give a written commitment to provide funds to New Company, he refused. In fact, Bollinger's counsel testified that Mayerson had "declined over and over again to put in writing the understanding or agreement that the buyer would have to provide to the business the working capital and the funds necessary to pay its debts and make the business grow."

The parol evidence rule is a rule of substantive law designed to protect the integrity of final, written agreements. *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E.2d 265, paragraph one of the syllabus. If contracting parties integrate their negotiations and promises into an unambiguous, final, written agreement, then evidence of prior or contemporaneous negotiations, understandings, promises, representations, or the like pertaining to the terms of the final agreement are generally excluded from consideration by the court. *Id.* at paragraph two of the syllabus.

Some cases have held that a party may offer evidence of prior or contemporaneous representations to prove fraud in the execution or inducement of an agreement. *Busler v. D & H Mfg., Inc.* (1992), 81 Ohio App.3d 385, 611 N.E.2d 352. Evidence of a collateral oral contract may be admissible so long as it does not conflict with the written contract and it covers a subject matter distinct from, though closely related to, the express subject matter of the written contract and not embodied in the written contract. *Sparhawk v. Gorham* (1956), 101 Ohio App. 362, 1 O.O.2d 305, 139 N.E.2d 652. Parties may not prove fraud by claiming that the inducement to enter into an agreement was a promise that was within the scope of the integrated agreement but was ultimately not included in it. *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 666 N.E.2d 235; *Busler v. D & H Mfg., Inc., supra.* The claim for fraud must be premised

on matters extrinsic to the written contract. See *Edwards v. Thomas H. Lurie & Assoc.* (Jan. 12, 1995), Franklin App. No. 94APE01–21, unreported, 1995 WL 12126. An oral agreement cannot be enforced in preference to a signed writing which pertains to the same subject matter. *Marion Prod. Credit Assn. v. Cochran* (1988), 40 Ohio St.3d 265, 533 N.E.2d 325.

The oral contract asserted by Bollinger and Bollinger, Inc., in support of their claims for fraud and breach of an oral contract is the alleged promise by Mayerson to provide limitless funding for the obligations of New Company. The substance of the alleged oral promise is clearly within the scope of the integrated agreements. The agreements related to all aspects of the sale of the assets of Old Company to New Company, including Bollinger's employment and Bollinger, Inc.'s royalty payments. In fact, the substance of the alleged oral promise was discussed by the parties during the negotiations period, but Mayerson refused to put such an agreement in writing, and it was ultimately not included within the final written agreements. The substance of the alleged oral promise is part and parcel of the subject matter contained in the integrated agreements, that is, the terms of the transfer of the assets of Old Company to New Company. Therefore, Bollinger and Bollinger, Inc., cannot contradict the terms of the written contract by evidence of the alleged oral promise. Further, under the facts of this case, Bollinger could not have justifiably relied on any alleged oral promise on the part of Mayerson to fund New Company without limit.

Bollinger and Bollinger, Inc., argue in their brief that the integration clauses did not bar their claims for fraud and breach of an oral contract because Mayerson and the Foundation were not parties to the agreements, the agreements being made between Bollinger, Old Company and New Company. We reject this argument. Mayerson was involved throughout the negotiations as the buyer. Mayerson was the sole equity shareholder of New Company. Mayerson signed the letters of intent and the Asset Purchase and Sale Agreement as trustee. He was identified in the Asset Purchase and Sale Agreement as the person who was to receive all "notices, requests, demands and other communications" on behalf of the "Buyer" (New Company). Mayerson and the Foundation were clearly not "strangers" to the agreements.

We hold that the integration clauses barred the claims for fraud and breach of an oral contract. The second and third assignments of error are sustained.

The fourth assignment of error alleges:

"The trial court erred in prohibiting defendants from cross-examining and introducing evidence related to the bankruptcy action."

The scope of cross-examination and the admission of evidence during cross-examination are matters within the sound discretion of the trial judge and

will not be disturbed on appeal in the absence of a clear and prejudicial abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493. Abuse of discretion connotes more than an error of law or judgment; it implies an unreasonable, arbitrary, or unconscionable attitude on the part of the court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 388–389, 473 N.E.2d 768, 780, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714, 86 L.Ed.2d 728; *Pembaur v. Leis* (1982), 1 Ohio St.3d 89, 91, 1 OBR 125, 126–127, 437 N.E.2d 1199, 1201.

▮ Following a review of the record, we hold that the trial court did not abuse its discretion in refusing to allow cross-examination of Bollinger about indications in the record of the bankruptcy proceedings that the bankruptcy court felt that Bollinger had acted in bad faith during the bankruptcy. The remarks in question were in the nature of dicta and unnecessary to the actual holdings of the bankruptcy court.

▮ Mayerson and the Foundation also complain that the trial court prevented them from putting on evidence which showed that some of the damages Bollinger was requesting in the instant case were identical to those she recovered in the bankruptcy action. To the extent the trial court excluded evidence of double recovery by Bollinger and Bollinger, Inc., it erred.

The fourth assignment of error is sustained to the extent that it alleges the trial court erred in refusing to allow Mayerson and the Foundation to present evidence of damages recovered by Bollinger and Bollinger, Inc., in the bankruptcy action which were identical to those sought in this case. It is overruled in all other aspects.

The fifth assignment of error alleges:

"The trial court erred in admitting prejudicial testimony under the guise of 'habit' or 'intent.'"

Mayerson and the Foundation argue that the trial court erred in admitting the testimony of two former employees of companies owned by Mayerson to show that Mayerson had a habit of cheating people in business transactions. One former employee testified that his employment with Mayerson was terminated before he received an equity interest promised by Mayerson which was payable when profits reached a certain level. Another former employee testified that he was terminated before receiving a promised ownership interest in another Mayerson company.

Evid.R. 406 provides:

"Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is

relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

The rationale for the admission of evidence of habit pursuant to Evid.R. 406 is that habitual acts may become semiautomatic and may tend to prove that one acted in the particular case in the same manner. *Cardinal v. Family Foot Care Centers, Inc.* (1987), 40 Ohio App.3d 181, 532 N.E.2d 162; *Bradley v. Farmers New World Life Ins. Co.* (1996), 112 Ohio App.3d 696, 679 N.E.2d 1178. In order for evidence of habit to be admissible, it must establish a regular or routine practice. Evidence as to one or two isolated occurrences does not establish a sufficient regular practice for admission pursuant to Evid.R. 406. *Cannell v. Rhodes* (1986), 31 Ohio App.3d 183, 31 OBR 349, 509 N.E.2d 963; *Bolan v. Adams* (1984), 19 Ohio App.3d 206, 19 OBR 349, 483 N.E.2d 1187. The proponent of habit evidence must first establish that the habit in fact exists and then show that the stimulus for the habitual response occurred on a particular occasion. *Mulford–Jacobs v. Good Samaritan Hosp.* (Nov. 20, 1996), Hamilton App. No. C–950634, unreported, 1996 WL 667833; *Sibert v. Columbus* (Feb. 27, 1992), Franklin App. No. 91AP–522, unreported, 1992 WL 41253.

We hold that the testimony of the former employees about two isolated instances in Mayerson's business career, which spanned over fifty years, does not rise to the level of sufficient evidence of habit, and therefore it was not admissible pursuant to Evid.R. 406.

The evidence which Bollinger and Bollinger, Inc., introduced was admissible, if at all, pursuant to Evid.R. 404(B). Evid.R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Following a review of the record, it is clear that Bollinger and Bollinger, Inc., used the testimony of the two former Mayerson employees to show that Mayerson had a "habit" of cheating people. In fact, plaintiffs' counsel referred in opening statement to Mayerson's "longstanding habit" of acquiring his wealth through "cheating people." Clearly the "other acts" testimony was used to prove the character of Mayerson as a "cheater" in business and that he acted in conformity therewith in dealing with Bollinger—evidence which Evid.R. 404(B) renders specifically inadmissible. See *Carter v. Simpson* (1984), 16 Ohio App.3d 420, 16 OBR 490, 476 N.E.2d 705 (evidence in a police officer's personnel file of instances of excessive force or improper behavior over a ten-year career was

inadmissible under Evid.R. 404[B] to show that he had acted with excessive force on a certain occasion).

We hold that the trial court erred in admitting the testimony of the two former Mayerson employees. The fifth assignment of error is sustained.

The judgment of the trial court is reversed, and the cause is remanded with instructions to the trial court to enter judgment in favor of Mayerson and the Foundation on the claims for fraud and breach of an oral contract and for further proceedings consistent with law and this opinion.

*Judgment reversed*
*and cause remanded.*

GORMAN, P.J., and HILDEBRANDT, J., concur.