*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0244P (6th Cir.)
File Name: 03a0244p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SIDDARTH SHAH and DAKSHA SHAH,

   *Plaintiffs-Appellants/*
*Cross-Appellees,*

   *v.*

RACETRAC PETROLEUM CO.,
   *Defendant-Appellee/*
*Cross-Appellant.*

Nos. 01-6077/6451

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 99-00410—James H. Jarvis, District Judge.

Argued: March 14, 2003

Decided and Filed: July 24, 2003

Before: CLAY and ROGERS, Circuit Judges; COFFMAN,
District Judge.[*]

---

[*]The Honorable Jennifer B. Coffman, United States District
Judge for the Eastern and Western Districts of Kentucky, sitting by
designation.

---

## COUNSEL

**ARGUED:** Jay W. Mader, ARNETT, DRAPER &
HAGOOD, Knoxville, Tennessee, for Plaintiffs. Debra L.
Fulton, FRANTZ, McCONNELL & SEYMOUR, Knoxville,
Tennessee, for Defendant. **ON BRIEF:** Jay W. Mader,
ARNETT, DRAPER & HAGOOD, Knoxville, Tennessee,
Mark A. La Mantia, FARRELL & LA MANTIA, Raleigh,
North Carolina, for Plaintiffs. Debra L. Fulton, FRANTZ,
McCONNELL & SEYMOUR, Knoxville, Tennessee, for
Defendant.

---

## OPINION

---

CLAY, Circuit Judge. Plaintiffs Siddarth and Daksha Shah
appeal from an order awarding summary judgment to
Defendant Racetrac Petroleum Company after Plaintiffs filed
a complaint in diversity jurisdiction pursuant to 28 U.S.C.
§ 1332 alleging various contract causes of action and raising
claims under the Tennessee Consumer Protection Act, Tenn.
Code Ann. § 47-18-109, and the Tennessee Petroleum Trade
Practices Act, Tenn. Code Ann. § 47-25-601. Defendant
cross-appeals from an order denying Defendant's
counterclaim for attorney's fees. We **AFFIRM** the district
court in part and **REVERSE** in part.

### FACTS

In late 1994, Plaintiffs became interested in purchasing
Raceway 773, a gas station and convenience store located in
Maryville, Tennessee. Defendant owned the store, exterior
improvements, and real property. Clyde and Gloria Holt
operated the Raceway pursuant to a lease and contract with

Defendant, which operates a chain of similar stores. The Holts planned to sell their interest in the lease and contract, which included certain interior improvements, inventory, and goodwill, for $90,000.

Plaintiffs learned about the offer from Bhanu Mehta, who also considered purchasing the business from the Holts. Mehta had previously reviewed the lease and contract under which the Holts operated the store. Mehta learned that each instrument contained a clause that arguably permitted either party to terminate the agreement upon thirty days written notice. When Mehta asked Holt about the termination clauses, Holt explained that as he understood them, Defendant would not terminate the lease or contract as long as the lessee made timely rental payments and operated the business in a satisfactory manner. Mehta had also inquired about the termination clauses present in the agreements held by other Raceway store operators. These other lessees similarly reported that Defendant would not terminate the lease or contract as long as the operator promptly paid rent and ran the business effectively. In December of 1994, Plaintiffs first reviewed the lease and accompanying contract for Raceway 773. The termination clause in the lease read:

2.  *TERM*. This Lease shall be effective on the 7th day of February, 1995, and subject to all its terms and conditions shall remain in full force and effect for twelve (12) months from date of execution. Upon termination of the lease term, this Lease will be automatically renewed for subsequent one-year terms upon the same terms and conditions, subject to Lessor's adjustments of the rental provided, however, that at any time during the initial or any extended term, either party may give thirty (30) days written notice in the form hereinafter described of its intent to terminate this Lease. Lessee acknowledges that this lease does not create, extend, or renew a franchise under any local, state, or federal law

including the Federal Petroleum Marketing Practices Act (PMPA).

The termination clause in the contract had essentially the same terms:

E.  *Term of Contract and Renewal*. – This Contract shall be for a duration of (12) months from date of execution, provided the Contractor complies with all the terms and conditions and covenants herein, it being the intent of the parties that the term of this Contract will run concurrently with the term of the Lease executed as of even date herewith. Provided that there has been no default as defined in the Contract within the existing term of the Contract, this Contract will be automatically renewed and the term of the Contract extended for subsequent one year terms. At any time during the initial or any extended term, either party may give thirty (30) days written notice in the form hereinafter described of its intent to terminate the Contract. Any such extension shall be upon the same terms and conditions as stated herein.

Furthermore, highlighted above the word "CONTRACT" on the document's first page, the contract states: "THIS CONTRACT DOES NOT CREATE A FRANCHISE RELATIONSHIP UNDER STATE OR FEDERAL LAW (See Paragraph C)." Paragraph C then states:

C.  *No Franchise*. – Contractor acknowledges that this Contract does not create, extend, or renew a franchise under any local, state, or federal law including the Federal Petroleum Marketing Practices Act (PMPA). Contractor fully acknowledges that this Contract with Contractee is a separate and distinct contract and is not associated with any other agreements, contracts or franchise relationships

which may now or hereafter exist between Contractee and Contractor. Contractor further acknowledges that Contractee is the retailer of the fuel facilty to be operated hereunder and that this Contract does not give any rights to the Contractor as a fuel retailer. Contractor further acknowledges that this Contract cancels any existing leases, agreements or other contracts, except any lease, agreement or contract of same date, or any ground lease on the Premises between the parties, that may have existed between Contractee and Contractor.

With respect to the title to the fuel, the contract provides:

F.   *Gasoline and Payment Obligations*. – Contractee owns and retains all title to the fuel at the property until sold to the customer. Contractor agrees that all funds collected for fuel sales are the property of the Contractee and further agrees to act as the agent of Contractee in the collection and safe keeping of all monies collected for sale of fuel. Contractor acknowledges that he owes a duty of trust to Contractee in the collection and safe keeping of all funds collected for sales and acknowledges that he holds himself in such fiduciary relationship to Contractee. Contractor agrees to remit funds so held in trust to Contractee upon demand or otherwise as directed by Contractee in cash or by cashier's check. . . . In addition, Contractor shall submit all books and records relating to the sale of fuel and gasoline products purchased from Contractee for an audit and taking of inventory.

Also significant, the contract contained the following merger provision:

Y.   *Entirety*. – This Contract, together with attached exhibits, and any other lease or contract executed the

same date, constitutes the entire understanding between the parties and supersedes and cancels all previous contracts between the parties with respect to the facilities covered hereby.

The contract's miscellaneous provision reiterates the integration clause:

Z.   *Miscellaneous*. –
     . . . .
     5.   This Contract supersedes and cancels all previous contracts or arrangements between the parties relating to the matters herein and no prior or subsequent stipulation, agreement or understanding, verbal or otherwise, of the parties or their agents relating to the matters herein shall be valid or enforceable unless embodied in the provisions of this Contract, or a separate instrument in writing.

Although Plaintiffs did not read all of the contractual provisions, they certainly saw the termination clauses.[1]

Plaintiffs expressed concern to the Holts about investing money in a business that they could lose upon thirty days notice. Clyde Holt told Plaintiffs what he told Mehta—that Defendant would not terminate a lease as long as the tenant performed acceptably. Plaintiffs also questioned J.D. Main, Defendant's district manager responsible for Racetrac 773. Main explained that "[Defendant's] policy is that they will not kick any dealer out as long as they perform satisfactorily." (J.A. at 137.)

---

[1]Plaintiffs also signed a guaranty relevant to the attorney fee dispute discussed in detail below.

Plaintiffs thereafter spoke with James Smith, who assumed Main's corporate role after Main departed. Plaintiffs explained that they could not afford to risk their money on an investment in Racetrac 773 without assurances that Defendant would not terminate the lease and contract on only thirty days notice. Smith echoed the earlier representations of the Holts and Main. According to Smith, "[Defendant] operates their business as a family. [Defendant] never kicks any dealer out from that business as long as it perform[s] satisfactorily." (J.A. at 137.) Furthermore, when Plaintiffs requested a five or ten year lease instead of Defendant's one year automatically renewable term, Smith advised Plaintiffs that Defendant would not agree to changes in the agreement, but counseled Plaintiffs not "to worry about it . . . you will not have any problem if you perform right." (J.A. at 148.) Finally, Smith recommended that Plaintiffs check with other Raceway operators about Defendant's reputation and practices. Plaintiffs received similar assurances to those Defendant made.[2]

Based on these oral assurances, Plaintiffs began to proceed with the transaction by completing a credit report for Defendant. Following approval of their credit, Plaintiffs executed separate closing documents with the Holts and Defendant at Raceway 773 on February 7, 1995. Smith attended on Defendant's behalf. Plaintiffs executed a

---

[2]Defendant often made these representations. Charles and Diane Farhat operated Raceway 773 before the Holts, from March 1990 until January 1993. The Farhats operated the business pursuant to a lease and contract containing similar termination clauses, but Smith advised Charles Farhat that Defendant would not terminate the contract or lease as long as he timely paid rent, operated the business in a satisfactory manner, and did not abuse the premises. Lalit N. Desai considered operating a Raceway store in Athens, Tennessee, in 1994. When he asked Main about the termination clauses, Main informed him that Defendant would not terminate the lease or contract as long as he maintained the premises, paid rent on time, and otherwise ran the business appropriately.

Confirmation of Purchase and Sale Agreement and paid $76,172.59 to the Holts, not including $5000 they previously tendered as earnest money. Plaintiffs then executed the lease and contract with Defendant. Before executing the agreements with Defendant, Siddarth Shah asked about the termination clauses a final time. Smith assured him that "[i]f you perform right we will not kick you out." (J.A. at 145.)

After executing the documents, Smith called Floyd Philpot, Defendant's general manager. Smith introduced Plaintiffs to Philpot, who welcomed Plaintiffs to "the Racetrac family." (J.A. at 141-42.) During his conversation with Philpot, Siddarth Shah reiterated his concerns about the termination clause, and Philpot repeated the same assurances.

At no point did Defendant inform Plaintiff that, regardless of a dealer's performance, Defendant used the termination clauses to terminate an operator's rights when Defendant sold a Raceway location.[3] At the time of the transaction, and

---

[3]Jackie Russell, Asset Manager in Defendant's Real Estate Department Russell, testified that Philpot must have known Defendant planned to sell Raceway 773:

Q:    Did you ever speak with Mr. Floyd Philpot regarding that store being offered for sale or any stores in his region being offered for sale?

A:    Actually, he is in the decision-making to put them for sale, so he would have known before me.

. . . .

Q:    So if a Raceway is going up for sale, he knows about it?

A:    Yes.

unbeknownst to Plaintiffs, Defendant was already trying to sell Raceway 773.[4]

Sometime in 1992 and again in 1994, Defendant contacted members of the Tennessee Oil Marketers Association to ascertain whether other oil companies were interested in purchasing some of Defendant's properties, including Raceway 773. In November of 1995, representatives from Downey Oil Co., Inc., contacted Defendant and inquired about purchasing Raceway 773.

(J.A. at 205, 50.)

---

[4] In his deposition Smith testified:

Q:     What was your understanding of how procedurally [Defendant] would sell a store when there's an operator in it?

A:     The thirty-day clause.

Q:     Okay. So is it fair to say then that it was your understanding that when [Defendant] wanted to sell a Raceway and there was an operator in it, that they would use the thirty-day clause?

A:     If that's what they chose.

Q:     But that was your understanding of historically how Racetrac would procedurally implement the sale of the store?

A:     Sure.

Q:     And you knew that at the time when you met [Plaintiffs] initially, correct?

A:     Yeah.

(J.A. at 178).

On February 10, 1995, three days after the closing, Jackie Russell, Asset Manager in Defendant's Real Estate Department, mailed a bid package of Raceway stores (including Raceway 773) to Worth L. Thompson of Fast Petroleum. In her cover letter to Thompson, Russell instructed him that when "visiting the stores please use discretion as our field employees or our Contract operators are not aware of this offering." (J.A. at 211.) To receive the offer at all, Fast Petroleum had to execute a Confidentiality Agreement with Defendant. Philpot made the ultimate decision on Defendant's behalf to keep a store's offering hidden from its operators.

After becoming operators, and with Defendant's approval, Plaintiffs continued to invest money in the business. They installed a surveillance system, improved the coolers, increased inventory, and cut an overhang wall. Smith advised Plaintiffs in May and December of 1995 that they had a satisfactory performance history and that they did not need to worry about Defendant terminating them. Smith also encouraged Plaintiffs to continue making improvements to the store.

In January of 1996, Smith telephoned Plaintiffs and told them that Defendant received an offer for the property. Although Smith did not disclose the identity of the potential purchaser, Downey Oil proposed to purchase Raceway 773 in December of 1995. Smith also advised Plaintiffs that they could bid on the property, but he did not provide them with specific terms or other information necessary to properly formulate a bid. Plaintiffs asked for information in writing, but failed to receive any. As a consequence, Plaintiffs did not make a bid.

On March 27, 1996, Defendant provided Plaintiffs with a letter serving as "a thirty-day notice of cancellation as provided in your Lease and Contract." (J.A. at 179.) Plaintiffs vacated the store one month later.

## PROCEDURAL HISTORY

Plaintiffs initially filed suit in the Circuit Court for Blount County, Ohio on December 9, 1996. Defendant removed the action to federal court on April 10, 1997. On February 3, 1998, the parties filed a joint stipulation of dismissal without prejudice pursuant to Fed. R. Civ. P. 41(a)(1).

Plaintiffs filed a second complaint against Defendant in the Circuit Court for Blount County, Ohio on February 2, 1999. Plaintiffs also included Downey Oil Company, Inc. ("Downey Oil"), as a defendant. Defendant again removed the action to United States District Court, but the case was quickly remanded back to Blount County for lack of subject matter jurisdiction because Downey Oil is a Tennessee corporation and Plaintiffs reside in Tennessee. The Plaintiffs then voluntarily dismissed Downey Oil as a Defendant, re-creating diversity jurisdiction, and Defendant again removed the matter to federal court on July 21, 1999.

Plaintiffs filed a second amended complaint setting forth multiple causes of action including breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, promissory fraud, fraudulent or negligent misrepresentation (including fraudulent concealment and nondisclosure), violation of the Tennessee Consumer Protection Act, and violation of the Tennessee Petroleum Trade Practices Act. Plaintiffs sought $579,000 in compensatory damages and $15 million in punitive damages.

Defendant generally denied the allegations, raised the Statute of Frauds as an affirmative defense, and asserted counterclaims for breach of contract, conversion, and attorney's fees. On June 5, 2000, Defendant filed a Motion to Dismiss or, in the alternative, for Summary Judgment.

On August 1, 2000, after Plaintiffs replied, the parties argued the motion before the trial court. The court took the matter under advisement and requested additional briefing on the claim under the Tennessee Petroleum Marketing Practices Act and the claim for fraudulent concealment and nondisclosure. On July 31, 2001, the court granted Defendant's Motion for Summary Judgment. Plaintiffs timely filed this appeal on August 29, 2001.

Relying on its counterclaim, Defendant moved the district court to award costs and attorney's fees under Fed. R. Civ. P. 54, but the court denied the request on October 12, 2001. Defendant timely appealed this order on November 6, 2001.

## DISCUSSION

We review summary judgment *de novo*. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466 n.10 (1992); *Johnson v. Econ. Dev. Corp.*, 241 F.3d 501, 509 (6th Cir. 2001); *Buckeye Cmty. Hope Found. v. City of Cuyhaoga Falls*, 263 F.3d 627, 633 (6th Cir. 2001). Summary judgment is appropriate when there is no genuine issue of material fact, thereby entitling the movant to a judgment as a matter of law. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996). In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), the Supreme Court explained that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252. Thus, our "inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict." *Id*.

The "mere possibility" of a factual dispute does not suffice to create a triable case. *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986). To defeat summary judgment, the plaintiff "must come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the defendant successfully demonstrates,

after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When determining whether to reach this conclusion, we view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000); *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998).

## I.

Plaintiffs first claim that Defendant committed promissory fraud. The Tennessee Court of Appeals set forth the elements of an action for fraud in *Stacks v. Saunders*, 812 S.W.2d 587 (Tenn. Ct. App. 1990):

(1) an intentional misrepresentation with regard to a material fact,

(2) knowledge of the misrepresentation [sic] falsity—that the representation was made "knowingly or "without belief in its truth," or "recklessly" without regard to its truth or falsity,

(3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and

(4) that the misrepresentation relates to an existing or past fact, or if the claim is based on promissory fraud, then the misrepresentation must embody a promise of future action without the present intention to carry out the promise.

*Id*. at 592 (citations omitted). To make a showing of promissory fraud within this framework, a plaintiff must

demonstrate that "a promise or representation was made with the intent not to perform." *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978). Tennessee courts have found promissory fraud in several cases. *See, e.g., Brungard v. Caprice Records*, 608 S.W.2d 585, 590 (Tenn Ct. App. 1980) (finding promissory fraud when defendant's talent scout made promises to induce aspiring singer to enter into recording contract, when evidence showed scout had no intent to keep the promises); *Steed Realty v. Oveisi*, 823 S.W.2d 195, 200-201 (Tenn. Ct. App. 1991) (finding promissory fraud when real estate vendor induced vendees to purchase property by promising to make certain improvements, when evidence demonstrated vendor never intended to make the improvements).

Significantly, the parol evidence rule does not apply to allegations of fraudulent misrepresentation inducing a party to enter a contract because under Tennessee law, promissory fraud sounds in tort, not in contract. *Brungard*, 608 S.W.2d at 588; *Steed Realty*; 823 S.W.2d at 202; *Haynes v. Cumberland Builders*, 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976). As this Court explained in *Cincinnati Insurance Co. v. Avery*, No. 89-5536, 1990 WL 132245, at *3 (6th Cir. Sept. 12, 1990) (unpublished), Tennessee law "does not require ambiguity when certain defects in the formation of the agreement are demonstrated; parol evidence can be admitted to contradict or vary the terms or enlarge or diminish the obligation of a written instrument upon a showing of fraud." (citing *McMillin v. Great S. Corp.*, 480 S.W.2d 152, 155 (Tenn. 1972)). Thus, the many oral statements Defendant made to Plaintiffs are relevant here.

Plaintiffs argue that Defendant fraudulently induced them to enter into the lease and contract by promising not to use the termination clauses for anything other than poor performance. Plaintiffs appear to have established a triable case under Tennessee law as outlined in *Stacks*, 812 S.W.2d at 592. First, the numerous assurances made by Smith and Main were

intentional and material. *See id.* Second, at least Smith knew he was offering false assurances, because he knew that Defendant used the termination clauses to remove operators if Defendant sold the property. *See id.* Third, Plaintiff reasonably relied on the multiple, uniform statements of Defendant's officials and suffered damages as a consequence. *See id.* Finally, Plaintiffs must show that "the misrepresentation . . . embod[ies] a promise of future action without the present intention to carry out the promise." *Id.* Defendant promised a future action—not to use the termination clauses to remove operators for any reason other than mismanagement—and Defendant probably had no intention of carrying out that promise, since (as Smith knew) Defendant regularly used the termination clauses to remove operators when Defendant wished to sell the property associated with the lease and contract. In fact, Raceway 773 was already for sale. At the very least, a genuine issue of material fact exists as to Defendant's intent.

Defendant claims that Plaintiffs cannot meet the third component of the test for promissory fraud because, Defendant argues, it is unreasonable *per se* to rely on oral representations when the contract contains an integration clause. Defendant relies on *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607 (6th Cir. 2001), in which this Court examined the non-renewal of a distributorship contract between Watkins as distributor and Iams, a pet food manufacturer. Watkins claimed Iams represented that if Watkins became an exclusive Iams distributor, Iams would make it the exclusive Iams distributor in Michigan when Iams established an exclusive territory distribution system. *Id.* at 609. Watkins alleged that it relied on these representations, but Iams terminated its agreement with Watkins and gave the exclusive contract to a competitor. *Id.* Watkins alleged promissory fraud under Ohio law. *Id.* at 611. The Watkins-Iams contract had a merger clause, however, and this Court found that it was unreasonable for Watkins to rely on Iams' oral statements when the contract contained a merger clause.

Despite Defendant's assertion otherwise, there is no rule that a merger clause makes reliance on oral representations unreasonable *per se* so as to necessarily defeat a fraudulent inducement or promissory fraud claim. *Watkins* is distinguishable in two respects. First, the *Watkins* Court made clear that it was reaching a fact-based conclusion, not announcing a new *per se* rule. The *Watkins* Court wrote that, "[o]n *the facts of this case*, we find that Watkins's reliance on Iams's representations was unreasonable as a matter of law. . . . *In this case*, the reasonableness of Watkins's reliance depends upon the effect of the integration clause." *Id.* at 612 (emphasis added). In *Watkins*, Iams evidently made only one misrepresentation, *see id.* at 609, whereas Defendant made *six* misrepresentations to Plaintiffs in response to Plaintiffs' obvious concerns. Second, *Watkins* relies on Ohio law for the principle that one acts unreasonably by relying on prior oral representations when a contract is completely integrated.[5] *See id.* at 612 (citing *Bollinger, Inc. v. Mayerson*, 689 N.E.2d 62, 69 (Ohio 1996)). Promissory fraud under Tennessee law does require reasonable reliance, *see, e.g., Dobbs v. Guenther*, 846 S.W.2d 270, 274 (Tenn Ct. App. 1992), but nothing suggests the Tennessee judiciary has either adopted or would adopt a *per se* rule that an integration clause makes it *always* unreasonable to rely on prior oral representations. *See Loew v. Gulf Coast Dev., Inc.*, No. 01-A-01-9010-CH-00374, at 1991 WL 220576, at *5 (Tenn. Ct. App. Nov. 1, 1991) (unpublished) (noting that integration clauses "should not be used to restrict the scope of proof" in fraud claims) (citing *Young v. Cooper,* 203 S.W.2d 376, 382-83 (1947)).

---

[5]To the extent *Watkins* is unclear, it is useful to consider that *Watkins* relies on *Bollinger, Inc. v. Mayerson*, 689 N.E.2d 62 (Ohio 1996), and *Bollinger* also never established a *per se* rule. *See Bollinger*, 689 N.E.2d at 70 ("Further, *under the facts of this case*, Bollinger could not have justifiably relied on any alleged oral promise on the part of Mayerson to fund the New Company without limit.") (emphasis added)).

For these reasons, Plaintiffs have raised a genuine issue of material fact with respect to their promissory fraud claim.[6]

## II.

Related to the promissory fraud claim, Plaintiffs allege Defendant violated the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-109. The TCPA grants a private right of action to consumers who suffer a loss due to "unfair or deceptive acts or practices" as defined in the Act. *Id*. In particular, the law proscribes "[r]epresenting that a consumer transaction confers or involves rights, remedies, or obligations that it does not have or involve." *Id*. at § 47-18-104(12). The TCPA also prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person." *Id*. at § 47-18-104(27). The Act's scope includes "the advertising, offering for sale, lease or rental . . . of any goods, services, property, tangible or intangible, real, personal or mixed." *Id*. at § 47-18-103(9).

Plaintiffs who successfully press allegations of promissory fraud often have TCPA claims as well. *See, e.g., Steed Realty v. Oveisi*, 823 S.W.2d 195, 201 (Tenn. Ct. App. 1991); *Brungard v. Caprice Records*, 608 S.W.2d 585, 589 (Tenn. Ct. App. 1980). Moreover, this Court has held that the TCPA does not require deceptive intent, which means a plaintiff may

---

[6]The district court made another argument that Defendant evidently abandoned on appeal. The court below found it very significant that, in response to Plaintiffs' effort to negotiate more favorable terms, Smith told Plaintiffs that "[Defendant's] policy is not to change the lease." (J.A. at 54.) According to the district court, this put Plaintiffs on "notice of Mr. Smith's lack of authority to vary the lease so that Mr. Smith's representations about future action by [Defendant] are not binding on [Defendant]." (*Id*.) This is unpersuasive. Smith, who represented Defendant, only said that he would not change the lease, not that he could not change the lease. Moreover, even reading Smith's remark as the district court did, Plaintiffs could still have reasonably believed Main (or some other corporate official) had the authority to change the lease.

recover damages even for negligent violations. *Menuskin v. Williams*, 145 F.3d 755, 767-68 (6th Cir. 1998).

Plaintiffs presented evidence that Defendant fraudulently represented it would not invoke the termination clauses except for poor performance. These assurances induced Plaintiffs to sign the lease and contract with Defendant, which violated the TCPA. *See* Tenn. Code Ann. § 47-18-104(27). The misrepresentations also made the transaction impermissibly appear as though it "involve[d] rights, remedies, or obligations that it does not have or involve." *Id*. at § 47-18-104(12).

The district court rejected Plaintiffs' TCPA claim because the court found Defendant did not commit the prerequisite fraudulent conduct. Defendant reiterates this position on appeal. Since, as discussed above, Plaintiffs have raised a genuine issue of material fact as to whether Defendant committed promissory fraud, Plaintiffs have also raised a genuine issue of material fact as to whether Defendant violated the TCPA.

## III.

Plaintiff next argues that the doctrine of promissory estoppel bars Defendant from using the termination clauses because of the representations Philpot made after Plaintiffs executed the agreement. This Court recognized and applied the generally accepted definition of promissory estoppel in *Owen of Ga., Inc. v. Shelby County*, 648 F.2d 1084, 1095 (6th Cir. 1981):

> Where one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forbearance, it is binding if injustice can be avoided only by enforcement of the promise.

(citing *Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422, 427 (Tenn Ct. App. 1978)).

Defendant makes the same claim it made with respect to promissory fraud, that Plaintiffs could not have reasonably relied on Philpot's statements after the execution because the lease and contract contained an integration clause. Defendant again points to *Watkins* for the principle that it is unreasonable *per se* to rely on oral representations when the contract contains an integration clause. As already explained, *Watkins*, which applies Ohio law, does not stand for such a broad proposition.[7] Moreover, Tennessee law has not clearly defined when reliance is reasonable enough to support a promissory estoppel claim. *Calabro v. Calabro*, 15 S.W.3d 873, 879 n.4 (Tenn. Ct. App.1999) ("Courts have not reached a uniform standard to determine if the promisor's words and actions justify the promisor's reliance."); *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991) ("The courts have not worked out a uniform standard to determine whether a defendant's words or actions justify the plaintiffs' reliance."). Nevertheless,

> the fact that the state law here involved may seem to be uncertain and that the question has not yet been answered by the State Court of Appeals or by an Appellate Court of the State does not relieve this court of its duty, since jurisdiction has been properly invoked, "to decide questions of state law whenever necessary to the rendition of a judgment."

---

[7]Defendant's entire *Watkins* argument hinges on one sentence, which is somewhat misleading when removed from context: "[i]f a written contract is completely integrated, it is unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made *prior to its execution*." *Watkins*, 254 F.3d at 612 (emphasis added). Philpot misled Plaintiffs about the termination clauses *after* Plaintiffs executed the agreement.

*Paschall v. Mooney*, 110 F.Supp. 749, 751 (D.C.N.Y. 1953) (quoting *Meredith v. City of Winter Haven*, 320 U.S. 228, 234-35 (1943)).

Although not absolutely dispositive, Tennessee case law is still very helpful. The fact-specific nature of any "reasonableness" inquiry inherently lends itself to flexibility. Tennessee courts have found promisees to have reasonably relied even when something suggested they should not have done so. *See, e.g., Alden v. Presley*, 637 S.W.2d 862, 863-64 (Tenn. 1982) (finding promisee stated promissory estoppel claim by reasonably relying on promisor's promise even though promisee continued to rely on promise with knowledge that promisor was dead); *Bank of Gleason v. Weakley Farmers Coop., Inc.*, No. W1999-02161-COA-R3-CV, 2000 Tenn. App. LEXIS 303, at *9 (Tenn. Ct. App. Apr. 9, 2000) (enforcing promise despite lack of agreement regarding type or quantity of product to be supplied) (unpublished).

Finally, when diversity jurisdiction forces us to grapple with an uncertain question of state law, we should approach the problem with the background assumption that the state judiciary would not formulate a new rule of equity that would produce an unfair result. Philpot served as Defendant's general manager. When, in response to the Plaintiffs' direct query, Philpot told Plaintiffs that the termination clauses would not be used except if Plaintiffs failed to perform satisfactorily, Philpot should have expected his assurances to "induce action or forbearance of a definite and substantial character on the part of the promisee." *Owen of Georgia, Inc.*, 648 F.2d at 427. At the very least, "there are disputes of material fact as to the alleged promises of defendant, the plaintiff[s'] action and response thereto, and any inferences

that legitimately may be drawn therefrom."[8]  *Calabro,* 15 S.W.3d at 879.

### IV.

Plaintiffs claim that Defendant fraudulently concealed important information.  As the Tennessee Supreme Court explained, "[t]he tort of fraudulent concealment is committed when a party who has a duty to disclose a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury."  *Chrisman v. Hill Home Dev., Inc.* 978 S.W.2d 535, 538-39 (Tenn.1998) (citing *Simmons v. Evans,* 206 S.W.2d 295, 296 (Tenn.1947)).  The duty to disclose arises in three distinct circumstances: (1) "[w]here there is a previous definite fiduciary relation between the parties," (2) "[w]here it appears one or each of the parties to the contract expressly

---

[8]Defendant never argues that the Statute of Frauds, Tenn. Code Ann. § 29-2-101(a)(5), would interfere with the operation of promissory estoppel.  Thus, we need not address this concern.  *Security Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 375 (6th Cir. 1999) (noting issues not addressed in appellate brief are deemed abandoned); *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (finding that issues adverted to by an appellant in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived).  Tennessee's Statute of Frauds may, in fact, create a problem for a promissory estoppel claim.  *See S.I.B.C. v. Ford Mtr. Credit Co.,* 911 S.W.2d 720, 723 (Tenn.App.1995) (declining to recognize promissory estoppel as an exception to the Statute of Frauds); *but see Engenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 20-21 (Tenn. App. 1997) ("Although the statute of frauds may prevent the defendants from seeking enforcement of an alleged oral agreement under these equitable doctrines [including promissory estoppel], the statute does not preclude [promisee] from recovering damages for unjust enrichment or detrimental reliance.").  In any event, Plaintiffs' part performance would exempt Defendant's oral promise from the Statute of Frauds.  *See Blasingame v. Am. Materials, Inc.,* 654 S.W.2d 659, 663 (Tenn.1983).  Plaintiffs had already paid Defendant substantial sums in rent and spent to make improvements to Raceway 773 based on Philpot's guarantee.

reposes a trust and confidence in the other," and (3) "[w]here the contract or transaction is intrinsically fiduciary and calls for perfect good faith."  *Domestic Sewing Mach. Co. v. Jackson*, 83 Tenn. 418, 425 (1885).

No previous fiduciary relationship existed between the parties, nor was this lease and contract agreement "intrinsically fiduciary."  *See Domestic Sewing*, 83 Tenn. at 425.  Nor were the parties in a confidential relationship.  Tennessee law defines a confidential relationship as one created when "confidence is placed by one on the other and the recipient of that confidence is the dominant personality with the ability because of that confidence to influence and exercise dominion over the weaker or dominated party."  *McGuirk Oil Co., Inc. v. Amoco Oil Co.*, 889 F.2d 734, 737-38 (6th Cir. 1989) (quoting *Edwards v. Travelers Ins. of Hartford*, 563 F.2d 105, 115 (6th Cir. 1977)).  Plaintiffs and Defendant in the instant case reached an agreement at arms' length, and Defendant did not "exercise dominion" over Plaintiffs.  None of the *Domestic Sewing* categories applies; thus, Defendants did not have a duty to disclose.

Plaintiffs argue for a broader interpretation of Tennessee law by citing a few cases in which the Tennessee Court of Appeals analyzed a fraudulent concealment claim without referring to the limits *Domestic Sewing* imposes.  *See, e.g.*, *Garrett v. Mazda Motors of Am.*, 844 S.W.2d 178 (Tenn. Ct. App. 1992).  Despite a few outliers, federal courts considering fraudulent concealment under Tennessee law have made clear that *Domestic Sewing* is the governing law.[9]  *See Aetna Cas.*

---

[9]We recognize that in *Simmons v. Evans*, 206 S.W.2d 295, 296 (Tenn. 1947), the Tennessee Supreme Court held that "each party to a contract is bound to disclose to the other all he may know respecting the subject matter materially affecting a correct view of it."  Subsequent Tennessee opinions have relied on *Simmons* and related decisions for the proposition that each party to a contract has a duty to disclose to the other all material knowledge of which the party is aware respecting the subject

*& Sur. Co. v. FDIC*, No. 90-5292, 1991 WL 23543, at *8 (6th Cir. Feb. 26, 1991) (unpublished); *French v. First Union Sec., Inc.*, 209 F. Supp. 2d 818, 825 (M.D. Tenn. 2002); *Morgan v. Wellman, Inc.*, 165 F. Supp.2d 704, 721 (E.D. Tenn. 2001). Thus, the district court properly granted Defendant summary judgment on Plaintiffs' fraudulent concealment and nondisclosure claim.

## V.

Plaintiffs next allege that Defendant breached the implied covenant of good faith and fair dealing. In Tennessee, "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987); *see also* TENN. CODE ANN. § 47-1-203 (imposing an obligation of good faith and fair dealing upon parties in the performance or enforcement of contracts). The nature of the duty "depends upon the individual contract in each case." *TSC Indus.*, 743 S.W.2d at 173.

The official commentary to the statute creating the implied covenant of good faith and fair dealing explains that the law

---

matter of the contract, other than the knowledge that one may gain through the exercise of ordinary diligence. *See, e.g., Gray v. Boyle Inv. Co.*, 803 S.W.2d 682, 685 (Tenn. Ct. App. 1990); *Lonning v. Jim Walter Homes*, 725 S.W.2d 682, 685 (Tenn. Ct. App. 1986); *Patel v. Bayliff*, No. W2002-00238-COA-R3-CV, 2003 WL 1193248, at *5 (Tenn. Ct. App. Mar. 12, 2003) (unpublished). However, these cases have generally been limited to real estate purchases, *see Patel*, 2003 WL 1993248, at *5 (noting the use of the doctrine in the real estate context), and used car sales, *see Mazda Motors of Am.*, 844 S.W.2d at 181; *Patton v. McHone*, 822 S.W.2d 608, 616 n.14 (Tenn. Ct. App. 1991). We decline to anticipate that the Tennessee Supreme Court would extend the *Simmons* and *Lonning* cases to the context of a franchise dispute. *Cf. O'Neil v. Burger Chef Sys., Inc.*, 860 F.2d 1341, 1346 (6th Cir. 1988) (questioning the applicability of *Lonning* to a suit by a franchisee alleging that the parent of the franchisor had not disclosed its intent to sell franchisor).

---

"does not support an independent cause of action for failure to perform or enforce in good faith." *See* TENN. CODE ANN. § 47-1-203. As one court explained, "good faith or the lack of it may be an element or circumstance of recognized torts, or breaches of contracts, but it does not appear that good faith, or the lack of it is, standing alone, an actionable tort." *Solomon v. First Am. Nat'l Bank*, 774 S.W.2d 925, 945 (Tenn. Ct. App. 1989). Breach of the implied covenant of good faith and fair dealing is not an independent basis for relief.

## VI.

Plaintiffs aver that the assurances Defendant made after Plaintiffs executed the lease agreement constitute an oral modification of the contract. Specifically, Philpot told Plaintiffs that Defendant would not use the termination clauses for any reason other than inadequate performance. Plaintiffs claim that under the agreement, *as modified*, Defendant would not terminate Plaintiffs for any reason other than inadequate performance. When Defendant invoked the termination clauses to sell the property, Plaintiffs argue Defendant breached the orally modified agreement.

In Tennessee, "[a]fter a written contract is made, it may be modified by the express words of the parties in writing, as well as by parol."[10] *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn Ct. App. 1991); *see also Co-Operative Stores Co. v. United States Fid. & Guar. Co.*, 195 S.W. 177, 180 (Tenn. 1917). The parol evidence rule is inapplicable to evidence of oral modification because the rule will "permit testimony to . . . show a subsequent modification to a written agreement. Once admitted, this evidence does not in any way deny what

---

[10]This is true even if the contract expressly specifies that the parties may only modify the agreement in writing. *Co-Operative Stores Co. v. United States Fid. & Guar. Co.*, 195 S.W. 177, 180 (Tenn. 1917).

the original agreement expressed; however, it merely demonstrates that parties may have exercised their right to modify the written agreement." *Golden Constr. Co. v. Greene*, No. 83-286, 1987 WL 18061, at *1 (Tenn Ct. App. Oct. 9, 1987) (unpublished); *see also GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610-11 (Tenn. Ct. App. 1990).

Defendant suggests that any oral modification would fail under Tennessee's Statute of Frauds. *See* TENN. CODE. ANN. § 29-2-101 (1980). The Statute of Frauds requires that parties memoralize certain types of contracts in writing. *Huffine v. McCampbell,* 257 S.W. 80, 89 (1923). The Statute of Frauds does not apply, however, once part performance occurs. *Blasingame v. Am. Materials, Inc.,* 654 S.W.2d 659, 663 (Tenn.1983); *Foust v. Carney,* 205 Tenn. 604, 329 S.W.2d 826, 829 (1959); *Buice v. Scruggs Equip. Co.*, 250 S.W.2d 44, 47 (Tenn.1952); *Schnider v. Carlisle Corp.*, 65 S.W.3d 619, 621 (Tenn. Ct. App. 2001). The Tennessee Supreme Court explained the "part performance" exception this way:

> Th[e] doctrine of partial performance to take the verbal contract out of the operation of the Statute of Frauds is purely an equitable doctrine and is a judicial interpretation of the acts of the parties to prevent frauds. The acts of the appellant relied on as partial performance had been done by him in pursuance to the averred contract and agreement and are clearly referable thereto. "The plaintiff must be able to show such acts and conduct of the defendant as the court would hold to amount to a representation that he proposed to stand by his agreement and not avail himself of the statute to escape its performance; and also that the plaintiff, in reliance on this representation, has proceeded, either in performance or pursuance of his contract, so far to alter his position as to incur an unjust and unconscious [sic] injury and loss, in case the defendant is permitted after all to rely upon the statutory defense." 49 *Am. Jur.,* Sec. 427, page 733.

*Buice*, 250 S.W.2d at 48. Plaintiffs altered their position to their detriment by installing a surveillance system, improving the coolers, increasing inventory, and modifying the store's layout. Plaintiffs might not have done so if they believed Defendant could terminate their lease and contract for reasons other than poor performance.[11]

Since part performance occurred, the Statute of Frauds did not prevent Defendant from modifying the agreement after its execution. Because Defendant invoked the termination clauses without alleging that Plaintiffs mismanaged Raceway 773, Plaintiffs have at least raised a genuine issue of material fact as to whether an oral modification occurred and, if so, whether Defendant breached the revised agreement.

## VII.

Finally, Plaintiffs claim Defendant violated the Tennessee Petroleum Trade Practices Act (TPTPA), Tenn. Code Ann. § 47-25-601. The TPTPA regulates petroleum trade practices in Tennessee. *See* TENN. CODE ANN. § 47-25-601. Most relevant here, the law provides that "[a]ny vertically integrated producer engaged in a franchise agreement with a dealer shall give sixty (60) days' notice to such dealer prior to termination or nonrenewal of such franchise agreement." *Id*.

---

[11] The district court dispatches with Plaintiff's breach of contract claim in just a few sentences: "In this case, plaintiffs do not dispute the fact that both the lease and the contract provide that 'either party may give thirty (30) days written notice' to terminate the initial lease or agreement as well as any extended lease or agreement. Nor is there any dispute that [Defendant] gave plaintiffs proper written notice of its intent to terminate both the lease and the contract. *Hence, plaintiffs do not, and cannot, point to any specific provision of either the contact or lease which was breached.*" (J.A. at 47) (emphasis added). The district court misunderstands Plaintiffs' argument. Plaintiffs are not arguing that Defendant breached the lease and contract agreement as originally written. Rather, Plaintiffs contend that Defendant breached the lease and contract agreement as orally modified.

at § 47-25-604(a)(1). Plaintiffs allege that Defendant violated this provision by affording only thirty days notice.

To receive the Act's protection, Plaintiffs must show (1) that Defendant is a "vertically integrated producer;" (2) that Defendant "engaged in a franchise agreement;" and that (3) Plaintiffs qualify as a "dealer."[12]

The TPTPA defines "vertically integrated producer" as "a producer controlling all phases of petroleum production and sale from the well through distribution to dealers as defined herein."[13] *Id*. at § 47-25-602(11). Although the record does not include information about the entire scope of Defendant's business operations, it appears Defendant could qualify as a "vertically integrated producer." It is significant that the contract between Plaintiffs and Defendant states that Defendant "owns and retains all title to the fuel at [Raceway 773] until sold to the customer." (J.A. at 87.) Neither Defendant nor the court below contends that Defendant is not a "vertically integrated producer" for any reason other than that Defendant does not distribute to "dealers" as defined in the TPTPA. Thus, if Plaintiffs are dealers, then Defendant can qualify as a "vertically integrated producer."[14]

---

[12] The district court found that Plaintiffs did not qualify as "dealers" within the meaning of the TPTPA, and did not address whether Defendant is a "vertically integrated producer" or whether Defendant "engaged in a franchise agreement."

[13] The TPTPA separately defines "vertical integration" as "the ownership or control of all phases of the production of petroleum products including the drilling, pumping, refining, distribution, and resale of such petroleum products by a person, firm, partnership or corporation or from the well to the gasoline pump." TENN. CODE ANN. § 47-25-602(11).

[14] Conceivably, Defendant could establish on remand that it is not a "vertically integrated producer" for some reason other than that Plaintiffs do not qualify as "dealers." Perhaps Defendant does not own

The TPTPA defines "franchise" as follows:

(5) (A) "Franchise" means a contract or agreement between a dealer and a distributor or producer of petroleum products or other related products which grants to the dealer the right and authority to sell or use in connection with the sale of petroleum products, motor fuel, or related products, such as tires, batteries, etc., a petroleum trademark, trade name, service mark, or other identifying symbol or name.

(B) "Franchise" includes a contract or agreement under which such dealer is granted authority to occupy premises owned, leased, or in any way controlled by a producer or distributor, which premises are to be employed for the sale or distribution of petroleum or related products under the producer or distributor's petroleum trademark, trade name, service mark, or other identifying symbol or name which is controlled by the distributor or producer.

TENN. CODE ANN. § 47-25-602. Pursuant to this definition, the lease and contract between Plaintiffs and Defendant creates a franchise relationship. Plaintiffs were "granted authority" to "lease" premises "employed for the sale or distribution of petroleum . . . under the producer or distributor's petroleum trademark." *Id.*

Defendant argues that the contract expressly provided that it would not create a franchise relationship. The contract did include several disclaimers purporting to guarantee that "this contract does not create a franchise relationship under state or

---

oil wells, for instance. The issue of whether Defendant is a "vertically integrated producer" was briefed by the parties for the trial court, but the trial court did not address the question in its short memorandum and order.

federal law." (J.A. at 42.) It would defeat the purpose of the TPTPA (and many other statutes like it) if parties could simply "opt-out" of otherwise applicable legislation by declaring that the law would not apply to their particular transaction. If the relationship between Plaintiffs and Defendant qualifies as a "franchise relationship" under the terms of the TPTPA, which it does, how the parties describe their relationship is irrelevant. *Petereit v. S.B. Thomas, Inc.*, 853 F. Supp. 55, 60 (D. Conn. 1993), *aff'd in relevant part*, 63 F.3d 1169 (2d Cir. 1995) (holding, when interpreting the Connecticut Franchise Act, that a court must determine parties' relationship by reality rather than disclaimers and labels in a contract).

Tenn. Code Ann. § 47-25-602(2) defines dealer as "any person, firm, corporation or partnership engaged in the sale of petroleum products to the public at retail." The statute then defines "sale at retail" as "any transfer, made in the ordinary course of trade or in the usual prosecution of the seller's business, of title to tangible personal property to the purchaser for use or consumption and/or for valuable consideration." TENN. CODE ANN. § 47-25-602(9). Defendant argues that Plaintiffs cannot meet this definition because, pursuant to the contract and lease agreement, Plaintiffs never had title to the gasoline. Yet, nothing in the definition actually requires the dealer to hold title to the petroleum—rather, the dealer must be involved in its "transfer." The statute does not define "transfer."

Legislative intent should guide this Court's attempt to apply an ambiguous statutory provision to a particular set of facts. *Security Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc.*, 64 F.3d 1001, 1007 (6th Cir. 1995) ("If a statute is found to be ambiguous, the ambiguity is resolved in favor of upholding the statute and giving effect to legislative intent."). The Tennessee legislature made its intent clear by including a "purpose" provision in the TPTPA:

The purpose of this part is to regulate vertical integration of the petroleum industry in Tennessee, it being the conclusion of the general assembly hereby expressed that vertical integration tends to operate in restraint of free trade and inhibits full and free competition and, therefore, tends to increase the price of petroleum and related products and services . . . .

TENN. CODE ANN. § 47-25-603(a). Since the district court never made the necessary factual findings, it is unclear whether Defendant qualifies as a "vertically integrated producer." It is undeniable, however, that the Tennessee legislature intended the TPTPA to regulate the activities of vertically integrated producers. As a consequence, this Court should broadly interpret the definition of dealer by including those operators, like Plaintiffs, who are *involved in* the transfer of title to petroleum products. Otherwise, vertically integrated producers could avoid the very legislation designed to regulate their activity by simply failing to relinquish title to their petroleum until it reaches the consumer—which, not coincidentally, is part of what "vertical integration" means.

A franchise agreement existed and Plaintiffs qualify as "dealers" within the meaning of the TPTPA. At this stage, we lack the factual basis to conclude that no genuine issue of material fact exists as to whether Defendant is a "vertically integrated producer."

## VIII.

Defendant counterclaimed for $60,000, including $51,354.25 for attorney's fees and $8,645.75 for alleged breach of contract and conversion of personal property. Correspondingly, Defendant moved for an award of attorney's fees under Fed. R. Civ. P. 54(d)(2)(B). The district court denied the motion because it lacked supplemental jurisdiction over Defendant's counterclaim and remanded the case to state court. "[I]n an effort to discourage defendant

from amending its counter-complaint in state court to increase the amount of attorney's fees, and therefore the amount in controversy, in order to again remove the matter," the trial court also stated that Defendant's claim for fees lacked merit. (J.A. at 395.)

Our decision to reinstate some of Plaintiffs' claims makes the supplemental jurisdiction issue moot, because Plaintiff now has a triable case worth more than the jurisdictional minimum. Nevertheless, we will still consider Defendant's counterclaim for fees because Defendant bases its counterclaim on substantive provisions of the disputed agreement governed by Tennessee law, which makes the counterclaim a contract action rather than a procedural motion. We review "a decision regarding the award of attorney's fees for an abuse of discretion." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 682 (6th Cir. 2003).

In pertinent part, the attorney's fees clause of the contract states that "if Contractee at any time rightfully seeks to recover possession of said premises and payment due and Contractee is obstructed or resisted therein and any litigation ensues, Contractors shall pay and discharge all costs and attorney's fees and expenses that shall arise from enforcing the covenants of the Contract."

None of the causes of action involve Defendant regaining possession of Raceway 773 or recovering payment due. Thus, the attorney's fees clause does not entitle Defendant to recover for defending Plaintiffs' claims.[15]

---

[15]Another well-established rule of contract construction points toward the same conclusion: "the language of the contract, where ambiguous, will be construed most strongly against the party who drew it." *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968); *see also APCO Amusement Co., Inc. v. Wilkins Family Rests. of Am., Inc.*, 673 S.W.2d 523, 528 (Tenn. Ct. App. 1984).

The pertinent section of the guaranty provides that "[g]uarantor agrees to pay all costs of collection, including reasonable attorney's fees and all costs of suit, in the enforcement of any right of the Lessor hereunder." Defendant's counterclaim for fees, however, does not involve Defendant's attempt to enforce any rights under the guaranty.[16]

## CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's rulings on fraudulent concealment and nondisclosure, the implied duty of good faith and fair dealing, and the counterclaim for attorney's fees, but **REVERSE** the district court's decisions on promissory fraud, breach of contract, promissory estoppel, the Tennessee Consumer Protection Act, and the Tennessee Petroleum Trade Practices Act.

---

[16]Defendant cites two cases, *Hosier v. Crye-Leike*, M2000-01182-COA-R3-CV, 2001 WL 799740 (Tenn. Ct. App. July 17, 2001) (unpublished), and *Pic 'N Pay Stores v. Jessee*, No. 79, 1986 WL 2148 (Tenn. Ct. App. Feb. 12,1986) (unpublished). Both of these cases are distinguishable because each involves claims in which a party to a contract attempted to enforce its rights under the guaranty. *See Hosier*, 2001 WL 7999740, at *3; *Pic 'N Pay*, 1986 WL 2148, at *1.